922 P.2d 1293 (1996)
130 Wash.2d 313
The STATE of Washington, Respondent,
v.
Victor Kenneth CANNON, Appellant.
No. 62416-0.
Supreme Court of Washington, En Banc.
Argued November 16, 1995.
Decided September 19, 1996.
*1295 Nielsen & Acosta, Eric J. Nielsen, David Koch, Seattle, Susan Herrero, Seattle, Mary J. Ferguson, Seattle, for Appellant.
Norm Maleng, King County Prosecutor, James Whisman, Peter Goldman, Timothy Bradshaw, King County Deputy Prosecutors, Seattle, for Respondent. *1294
*1296 ALEXANDER, Justice.
Victor Cannon appeals his conviction and sentence on a charge of rape in the first degree, contending that the trial court erred in allowing so-called DNA evidence to be admitted into evidence at his bench trial. He also assigns error to the trial court's refusal to grant his motion to dismiss the rape charge for alleged violations of the time for trial and discovery rules. Finally, he challenges the trial court's imposition of an exceptional sentence. We affirm the trial court in all respects.
In the early morning hours of May 25, 1990, G.S. was driving alone in her Camaro in south Seattle. She was following another car that was being driven by an acquaintance, J.S. While so engaged, G.S.'s vehicle was suddenly "rammed" on the left side by a full sized Ford pickup. Seattle Police Dep't Case File (SPD File) at tab 1, pp. 3, 4.[1] Although the impact knocked her car onto the shoulder of the road, she did not immediately stop her vehicle, being concerned that the driver of the truck had "deliberately struck" her. SPD File at tab 1, p. 2. Eventually, however, the driver of the truck was able to force G.S. to stop her car on a side street. The driver of the truck, a male, then got out of his vehicle, walked to G.S.'s car, and accused her of causing the collision between her car and his truck.
When G.S. stepped out of her car to respond to the other driver's protestations, the man "grabbed her by her right arm and pulled her to the guard rail ... [where he] grabbed [her] by the hair and pulled her over the guard rail." SPD File at tab 1, p. 4. G.S. began fighting the man in an effort to defend herself, but he "threw her down the embankment." SPD File at tab 1, p. 4. She ended up some 30 feet away from where the affray had commenced, in the midst of a thorny bush. G.S.'s attacker caught up with her and upon doing so, hit her at least twice on the left side of her head. He then ordered her to remove her pants. G.S. complied, but complained that the "stickers" were scratching her and causing her pain. SPD File at tab 1, p. 5. Her attacker responded by punching her in the head with a closed fist again and saying: "So you've never been raped before." SPD File at tab 1, p. 5. He then penetrated her vaginally with his fingers and penis, and forced her to perform oral sex on him.
The rapist, who had been unknown to G.S., climbed the embankment and was returning to his truck when J.S. arrived on the scene, after locating G.S.'s now-vacant car. Before G.S.'s assailant drove away in his truck, J.S. was able to note a description of the truck and observe that the driver was a white male. J.S. then took G.S. to Highline Community Hospital where she remained for several days for treatment of a concussion and multiple abrasions on her back, arms, and legs. While G.S. was hospitalized, she underwent a battery of tests during which specimens of bodily fluids were collected from her and her clothing for later analysis.
On July 27, 1990, Victor Cannon was stopped for speeding in his full sized Ford pickup, which Seattle Police Officers noticed had similarities to the vehicle that had been reported to have been involved in the rape of G.S. Cannon subsequently became the focus of the investigation into that rape. Search warrants were thereafter issued authorizing the seizure of blood, saliva, and hair samples from Cannon, and for the seizure and search of his truck. Three days later Cannon appeared in a line-up that was viewed by G.S. She recognized Cannon in the line-up as "familiar," but was unable to positively identify him as the man who had raped her two months earlier. SPD File at tab 9, p. 1. Two analysts who separately examined Cannon's and G.S.'s vehicles reported that "it is more probable than not, that [Cannon's] Ford struck [G.S.'s] Camaro." SPD File at tab 19, p. 2.
On November 29, 1990, Cannon was charged in King County Superior Court with first degree rape, "under circumstances where the defendant kidnapped and inflicted serious physical injury on [G.S.]." Clerk's Papers at 2. Cannon was also charged in the *1297 same information with attempted rape in the first degree arising out of an incident allegedly occurring on November 22, 1990, in which it was alleged that Cannon assaulted another woman, S.T., who was reportedly similar in appearance to G.S., lived in the same apartment complex as G.S., and, like G.S., was a bartender in the Burien area. The count involving S.T. was subsequently amended to attempted rape in the second degree. On Cannon's motion, the two charges were severed for trial.
At Cannon's arraignment on the charge of rape in the first degree arising from the alleged attack on G.S., his trial was scheduled for February 11, 1991, a date that was within the time limits for trial as provided in CrR 3.3. At an omnibus hearing held thereafter, the State requested, and the trial court authorized, a second draw of Cannon's blood in order to replace a blood sample that, according to the State, had been found to "have deteriorated to the point [where it was] useless" to the laboratory that was conducting a Deoxyribonucleic Acid (DNA) analysis of Cannon's blood. Clerk's Papers at 6.
Cannon did not go to trial on February 11. On February 19, the date that the trial court had determined Cannon's time for trial would expire, the State moved to extend the trial date two days for the reason that the deputy prosecutor assigned to represent the State was in trial on another case. Cannon did not object to this request. The trial court, relying on CrR 3.3(d)(8), granted the State's motion. On February 21, another extension of the trial date was requested by the State for the same reason. This request was also granted. Cannon again did not object, and the trial was reset for February 27.
The deputy prosecutor sought an additional continuance of the trial date on February 27, indicating that he expected to be available for trial the next day. On this occasion, Cannon objected to the continuance and moved to dismiss the charge for what he claimed was a violation of CrR 3.3, the time for trial rule. At a hearing the following day, the trial court heard extensive argument on whether to grant the State's request for another continuance of the trial date. During the hearing, the deputy prosecutor informed the trial court that the results of tests of Cannon's blood sample, which were being conducted by the FBI, had not yet been received by the prosecutor's office. Cannon also moved at that hearing to dismiss the first degree rape charge, contending that prosecution's handling of the blood sample and paint chips constituted discovery abuse and case mismanagement, thus violating his due process rights. The trial court granted a five-day continuance of the trial date to March 7. It did so after considering, on the record, factors relevant to both Cannon's case and another trial that had been assigned to that court for trial. These factors included the availability of witnesses and evidence in both cases, as well as the original trial dates and predicted length of both cases.
On March 7, the trial court denied Cannon's motion to dismiss the charge against him for what Cannon had contended was a violation of CrR 3.3, concluding that the prosecutor's over-assignment of cases was "unforeseen." Report of Proceedings (RP) (3/7/91) at 28. Finally, on March 8, it denied Cannon's motion to dismiss the first degree rape charge for what Cannon alleged was discovery abuse and case mismanagement, ruling that the prosecution's handling of the scientific tests had been appropriately "diligent." RP (3/8/91) at 22.
On April 29, a hearing was conducted to determine the admissibility of the results of the testing of samples taken from Cannon and G.S., as well as from G.S.'s clothing. At that hearing, the State called three witnesses: Dr. Bruce Budowle, director of DNA research for the FBI; Dr. Stanley M. Gartler, a professor of genetics and medicine at University of Washington; and Dr. Richard Gelinas, director of gene regulation at ICOS Corporation, a Bothell-based pharmaceutical research and development firm.
Dr. Budowle described the laboratory processes employed by the FBI to extract DNA from a sample and separate it into bands representing identifiable sections (alleles) of the DNA. He also described the process by which the FBI laboratory causes those bands to be arranged in an autoradiograph (a form that can be visually inspected), and how an autoradiograph of one sample is compared *1298 with that of another sample or samples. Budowle also testified about the data upon which the FBI relies in estimating the frequency with which certain alleles can be expected to appear in a given population. It is this data, according to Budowle, that underlies the statistical significance of a "match" or series of "matches" between DNA from a known source (e.g., Cannon's blood sample) and that from an unknown source (e.g., stains and specimens obtained from the clothing G.S. was wearing on May 25, 1990). Dr. Gelinas and Dr. Gartler testified about probability and human genetic theories upon which the FBI relied in calculating the statistical significance of DNA matches.
In response, Cannon's counsel presented the testimony of Dr. William Shields, a professor at the College of Environmental Science and Forestry of the State University of New York. He described concerns that he and other scientists had raised regarding the FBI's genetics and statistical theories, and the reliability of the FBI's data base. Cannon also presented the testimony of Dr. Peter d'Eustachio, an associate professor of biochemistry at New York University, who critiqued the FBI's laboratory protocol.
Following the hearing, the trial court granted the State's motion to admit the FBI's report containing the results of tests conducted at its laboratory, and denied a defense motion to exclude the report. The trial court, relying on Frye v. United States, 293 F. 1013, 34 A.L.R. 145 (D.C.Cir.1923), found that each of the following matters had gained general acceptance in the scientific community: (1) the theory that "DNA forensic testing can produce reliable results"; (2) the existence of techniques "that are capable of producing reliable results in DNA identification"; (3) "the protocol developed by the FBI for determining that DNA patterns from a known suspect source matched with DNA patterns from a crime scene source"; and (4) "the processes implemented by the FBI for determining the probability of a match." RP (5/13/91) at 111-12.
Cannon thereafter waived his right to trial by jury on the charge of raping G.S., and, together with the State, stipulated to the facts as presented in certain police reports and exhibits.[2] In its oral ruling, the trial court recounted the many items of evidence "that point so clearly to the defendant," and indicated:
No one of these little coincidences by themselves do more than point to the defendant. But you put it all together, and they raise a very strong presumption that it's the defendant who was there [at the rape scene]. It's only by considering beyond a reasonable doubt that, yes, it is possibly speculative that someone else drove the [red pickup truck].
RP (5/13/91) at 172, 173.
The trial court then addressed the FBI's DNA test results, which it believed showed "that the samples of blood taken from the defendant, Victor Kenneth Cannon, contain DNA fragments that match with the DNA fragments from the cutting from the panties of the victim of the first degree rape alleged in this case," and that "the probability of selecting an unrelated individual at random from the Caucasian population, having a DNA profile matching defendant's blood, is approximately one in 90,000." RP (5/9/91) at 105-06. After discussing arguments by defense counsel regarding the possible fallibility of the FBI's lab work, the trial court found that even when "taking into account human factors, humans' ability to error," the FBI's DNA test results provided "a reliable estimate." RP (5/13/91) at 173, 174. The trial court consequently said that it had "no doubt ... that Mr. Cannon is the perpetrator of the rape in this case," concluding, finally, that he was guilty of rape in the first degree. RP (5/13/91) at 174.
The trial court thereafter imposed an exceptional sentence of 150 months in prison, which it ordered Cannon to serve consecutively to the standard range sentence of 97 ½ months it imposed on him for his conviction *1299 for attempting to rape S.T.[3] Cannon appealed his conviction and sentence on the first degree rape charge to the Court of Appeals, Division One. The State moved, pursuant to RAP 4.3, to transfer the appeal to this court, and we granted its motion.

I. DNA Evidence
Cannon contends that the trial court erred in holding that the FBI's protocol for determining a DNA match, as well as its processes for determining the probability of such a match in a random population, is generally accepted in the scientific community. See Frye, 293 F. 1013. Specifically, Cannon challenges the trial court's decision to admit the DNA evidence on the basis of the so-called "binning" technique and other protocols used by the FBI to determine whether two DNA samples "match." He also complains that the population statistics and assumptions that the FBI used to quantify the significance of a series of "matches" have not gained general acceptance in the relevant scientific community. In support of this contention, Cannon states that the FBI's protocols and statistics are not consistent with the recommendations contained in a 1992 report of the National Research Council, which followed the Council's three-year study of DNA testing.
As we recently explained in State v. Copeland, 130 Wash. 244, 922 P.2d 1304 (1996), a controversy has existed in the scientific community over admissibility of DNA evidence of restricted fragment length polymorphism typing, the DNA testing method used in this case, because of concerns about substructuring in human populations and use of the product rule. See also State v. Cauthron, 120 Wash.2d 879, 846 P.2d 502 (1993). Those challenging the admissibility of such evidence criticize the size, quality, and diversity of the FBI's data bases. Many of those critics also challenge the FBI's laboratory procedures and methodology. As we explained at some length in Copeland, there is no longer any significant support in the relevant scientific fields for those arguments against the use of the product rule to calculate the statistical probabilities of the frequencies of the occurrence of a particular genetic profile in human populations. Thus, the product rule calculation method and the population theories that underlie its use in this case satisfy the Frye test for admissibility of novel scientific evidence.
The State argues additionally, as it did in Copeland, that the Frye standard should be abandoned in favor of the test set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Having concluded in Copeland that the Frye test remains the applicable standard in Washington, we similarly reject the State's request here that we abandon Frye.
In Copeland, we also addressed a number of challenges raised by the defendant in that case concerning laboratory error rates, the size, quality, and randomness of the FBI's data bases, and the FBI's methodology and practices, including its methods and criteria for declaring a match. We held in Copeland that those challenges involve questions of admissibility under ER 702 alone and not admissibility under Frye. Because Cannon's challenges based on those grounds are controlled by our decision in Copeland, we conclude that the trial court did not err in concluding that the challenges were unpersuasive, and in admitting the DNA evidence.

II. Time for Trial Issues
Cannon asserts, additionally, that the trial court erred in denying his motion for dismissal for what he alleges was a violation of CrR 3.3. He contends, in that regard, that the continuances granted prior to March 8, 1991 were not justified under CrR *1300 3.3(d)(8),[4] and that, without excluding the period of time covered by these continuances from the computation of the time for trial, his right to be tried within the time provided by CrR 3.3 was violated.[5]
Cannon supports this contention by arguing that the deputy prosecutor assigned to the trial of the charge of rape in the first degree sought the continuances only because he was overburdened with other trials. This circumstance, he asserts, was "neither unavoidable nor unforeseen." Br. of Appellant at 56. The State responds by contending that the deputy prosecutor's scheduling conflict was unavoidable, and pointing out, additionally, that the trial court considered several pertinent factors and did not limit its consideration merely to the prosecutor's scheduling problems when it ordered the last of the extensions at issue here.
"[A] trial court's grant or denial of a motion for a CrR 3.3 continuance or extension will not be disturbed absent a showing of a manifest abuse of discretion." State v. Silva, 72 Wash.App. 80, 83, 863 P.2d 597 (1993). Here, the record indicates the deputy prosecutor was, indeed, occupied in another trial at the time he requested the first two continuances, a circumstance that has justified the continuance of a trial date, particularly when, as here, "the defendant is not prejudiced by a minor delay, and the defendant has not informed the prosecutor of his or her intent to rely on the rules before the speedy trial period has expired[.]" State v. Fladebo, 113 Wash.2d 388, 394, 779 P.2d 707 (1989). In addition, when the trial court granted the third request for extension of the trial date, and denied Cannon's motion to dismiss for alleged violation of CrR 3.3, it noted on the record that it was aware that both parties were still awaiting the DNA test results, and that another case that had been assigned to the trial court was also ripe to be heard. We are satisfied that the court properly balanced these relevant considerations when "exercising its duty to assure that all cases are heard as promptly as possible." State v. Angulo, 69 Wash.App. 337, 344, 848 P.2d 1276, review denied, 122 Wash.2d 1008, 859 P.2d 603 (1993).
We are not unmindful of Cannon's observation that a mere generalized reference to docket congestion is insufficient to justify a delay in the setting of trial dates. RP (3/7/91) at 28 (citing State v. Mack, 89 Wash.2d 788, 794-95, 576 P.2d 44 (1978)). The basis upon which the trial court decided this issue, however, is distinguishable from the situation facing the trial court in Mack. Here, the trial court was not setting the initial trial date, but rather was considering motions for continuances that were based, in part, on specific scheduling difficulties of the trial court and the deputy prosecutor. In our view, the trial court appropriately weighed these various factors when it ordered the continuances. Because the trial court did not abuse its discretion in granting the continuances to March 7, 1991, it did not err in denying Cannon's motion to dismiss.

III. Discovery
Cannon contends that three incidents, which he labels as "case mismanagement" and "violations of discovery rules" by the State, amount to a violation of due process. Br. of Appellant at 70. In light of what he asserts these due process violations were, he claims that the trial court abused its discretion in denying his motion for dismissal.
The incidents to which Cannon refers are what he claims was the State's mishandling of the first sample of his blood, its slow production of the results of the FBI's DNA tests on his blood, and the Washington State Patrol's crime laboratory report regarding paint chips evidence. Cannon argues that these incidents effectively denied him the *1301 opportunity to adequately prepare his defense. Dismissal, he argues, was warranted under CrR 4.7 and CrR 8.3.[6]State v. Burri, 87 Wash.2d 175, 180, 550 P.2d 507 (1976).
We are not persuaded that these incidents, about which Cannon complains, constitute discovery abuses. The purpose of the discovery rules cited by Cannon is to prevent a defendant from being prejudiced by surprise, misconduct, or arbitrary action by the government. See State v. Blackwell, 120 Wash.2d 822, 831, 845 P.2d 1017 (1993); State v. Bradfield, 29 Wash.App. 679, 682, 630 P.2d 494, review denied, 96 Wash.2d 1018, 643 P.2d 882 (1981). In our judgment, there was no such surprise or conduct that can be said to be inappropriate action by any governmental agency.
Even assuming, however, that the State's actions constituted violations of the rules of discovery, dismissal would not be appropriate. Dismissal of a case for discovery abuse is an extraordinary remedy that is generally available only when the defendant has been prejudiced by the prosecution's actions. Blackwell, 120 Wash.2d at 830-32, 845 P.2d 1017. (CrR 8.3); Smith, 67 Wash.App. at 851-53, 841 P.2d 65 (CrR 4.7).
Cannon, citing State v. Price, 94 Wash.2d 810, 620 P.2d 994 (1980), contends that he suffered prejudice by being forced to choose between his right to a speedy trial and his right to effective assistance of counsel. Br. of Appellant at 73-75. In that case, the court held that in order to show prejudice justifying dismissal, the defendant must establish "by a preponderance of the evidence that interjection of new facts into the case when the State has not acted with due diligence will compel him to choose between prejudicing either of these rights." Price, 94 Wash.2d at 814, 620 P.2d 994. Cannon cannot meet this burden because his trial counsel was placed on notice from the time of charging that the State intended to introduce scientific evidence relating to blood samples and paint chips in order to tie Cannon to the crime. Furthermore, as the trial court noted, Cannon failed to show that the timing of his receipt of the relevant final reports interfered with his ability to investigate the procedures employed by the FBI and the Washington State Patrol in analyzing the evidence. Because no new facts relevant to those procedures were interjected into the case by the reports, it cannot be said that the delay caused him to have to choose between his right to a speedy trial and his right to effective assistance of counsel. The trial court's refusal to grant Cannon's motion to dismiss for alleged discovery abuse and purported violation of his due process rights was not error.

IV. Filing of Findings and Conclusions
Cannon asserts, for the first time on appeal, that his first degree rape conviction should be reversed and the charge dismissed because the trial court failed, until almost two years after he was sentenced, to enter written findings of facts and conclusions of law supporting the finding of guilt. He argues that the delay here is particularly egregious in that the written findings and conclusions were not filed until after his opening brief was filed in the Court of Appeals.
The purpose of requiring written findings and conclusions is to ensure efficient and accurate appellate review. State v. McGary, 37 Wash.App. 856, 861, 683 P.2d 1125, review denied, 102 Wash.2d 1024 (1984). Although the practice of submitting late findings and conclusions is disfavored, they may be "submitted and entered even while an appeal is pending" if the defendant is not prejudiced by the belated entry of findings. McGary, 37 Wash.App. at 861, 683 P.2d 1125; see also State v. Hillman, 66 Wash.App. 770, 773-74, 832 P.2d 1369, review denied, 120 Wash.2d 1011, 841 P.2d 47 (1992).
*1302 Here, it is apparent that no prejudice flowed to Cannon because of the late filing of findings and conclusions. Significantly, the appeal was not delayed by the late filing. Although Cannon asserts that it was unfair to allow the entry of findings after he had framed the issues and argument in his brief, a comparison of the late-filed findings and conclusions with the trial court's oral ruling shows that the State did not tailor or alter the findings and conclusions to meet issues and arguments raised by Cannon in his brief submitted to the Court of Appeals.

V. Exceptional Sentence
Lastly, Cannon challenges the trial court's imposition of a sentence that was exceptional in that it exceeded the standard range for rape in the first degree, and was consecutive to the sentence arising from his conviction on the other charge in the information. In this regard, he argues that (A) the trial court violated the "real facts" doctrine when it considered a presentence report relating to a prior conviction; (B) the findings of fact that the trial court employed to justify the exceptional sentence were not supported by the record; (C) the findings of fact do not support the conclusions that he manifested deliberate cruelty and poses a future danger; and (D) the sentence is clearly excessive. We will discuss each contention separately.

A. Reliance on Presentence Report Relating to Prior Conviction
Cannon argues that the trial court violated the "real facts" doctrine when, in lieu of a current presentence report, the trial court considered a presentence report that had been prepared for the Pierce County Superior Court a year earlier, in 1990, when Cannon was before that court for sentencing on a conviction for child molestation. The "real facts" doctrine is embodied in the Sentencing Reform Act of 1981,[7] and requires a sentencing court to "consider only the actual crime of which the defendant has been convicted, his or her criminal history, and the circumstances surrounding the crime." State v. Houf, 120 Wash.2d 327, 333, 841 P.2d 42 (1992) (emphasis ours).
In our judgment, the sentencing court did not run afoul of the real facts doctrine when it considered the 1990 presentence report. That report, which included a summary of a sexual deviancy therapist's evaluation of Cannon, was prepared to assist the Pierce County Superior Court in determining whether Cannon was amenable to treatment under the so-called special sexual offender sentencing alternative (RCW 9.94A.120(7)), and indicated that Cannon had expressed a willingness, in 1990, to undergo sexual deviancy treatment. These facts, which were disclosed to the trial court for the first time in the 1990 presentence report, reveal Cannon's criminal history and relate to the circumstances surrounding the current crime, in that they showed that Cannon raped G.S. mere months after he had acknowledged the need for him to submit to such treatment in connection with his guilty plea to a charge of child molestation. See RP (6/11/91) at 34-35. In our judgment, the trial court properly considered these facts before sentencing Cannon on the instant offense.
Cannon asserts, alternatively, that even if it was not error for the sentencing court to consider the presentence report prepared for the Pierce County Superior Court, the trial court violated his constitutionally protected due process rights when it denied his request to have a mental health expert appointed to assist him in rebutting that portion of the report containing the therapist's conclusion that Cannon was a sexual deviant who would benefit from treatment. He correctly points out that due process requires that evidence relied upon by a sentencing court must be reliable and that the defendant must have had an opportunity to refute the evidence. State v. Strauss, 119 Wash.2d 401, 418-19, 832 P.2d 78 (1992). He is incorrect, however, in asserting that the presentence report that was relied upon by *1303 the trial court was not reliable and that he had no opportunity to refute the information contained in it.
As noted above, the trial court primarily relied upon the presentence report from the prior case to become informed as to aspects of Cannon's criminal history that had not otherwise been disclosed to it. Significantly, Cannon does not seriously contest the reliability or accuracy of that report's representation of his criminal history. Even assuming the trial court also relied on the therapist's conclusions that are set forth in that report in reaching its conclusion that Cannon posed a future danger of reoffending, there is no suggestion that Cannon did not voluntarily provide the information upon which that opinion was based. Furthermore, he had an opportunity to refute that information prior to the time that report was prepared, and also at his sentencing in the instant case. He did not do so.

B. Findings Supported by Record
Cannon next contends that many of the findings of fact entered by the trial court in support of the imposition of an exceptional sentence are not supported by the record. An appellate court reviews the record that was before the trial court under the clearly erroneous standard to determine whether the reasons given by the sentencing judge find support. State v. Pryor, 115 Wash.2d 445, 450, 799 P.2d 244 (1990).
We have reviewed the stipulated record in detail and conclude that it supports the essential facts that are found in each of the findings to which Cannon assigns error. While the findings do contain what could be considered as inaccurate references to the dates that Cannon was scheduled to undergo sexual deviancy treatment as a result of his prior conviction, and states, without support in the record, that "[G.S.] drifted in and out of consciousness" while being beaten and raped, these portions of the findings are not significant. Clerk's Papers at 211. Importantly, the findings that remain are amply supported in the record, and, as is discussed below, support the trial court's imposition of an exceptional sentence.

C. Findings Support Cannon's Cruelty and Danger
Cannon also contends that the trial court erred in concluding that he acted with "manifest deliberate cruelty" and that the "exceptional sentence imposed in this case [was] the best hope of protecting the public from [Cannon]." Clerk's Papers at 212-14. He argues that his conduct in raping G.S. was not "significantly more serious or egregious than typical of the crime," and that the State has failed to adequately show that he is not amenable to treatment. Br. of Appellant at 129.
The State counters by reciting the trial court's findings regarding the rough treatment of G.S. by Cannon. These included findings that Cannon repeatedly hit G.S.'s head with his fist, and sexually penetrated her multiple times. In addition the trial court found that his refusal to allow G.S. to move from "a bed of blackberry bushes" and his verbal humiliation of her demonstrated Cannon's callous disregard for his victim. Clerk's Papers at 380. Factors such as these have been held in other cases to constitute deliberately cruel conduct, and were appropriately applied in this case. See, e.g., State v. Garza, 123 Wash.2d 885, 886-88, 872 P.2d 1087 (1994); State v. Herzog, 69 Wash.App. 521, 526, 849 P.2d 1235, review denied, 122 Wash.2d 1021, 863 P.2d 1353 (1993).
The State also points out that, with respect to what Cannon contends is an inadequate showing of Cannon's future dangerousness to commit sexual offenses, it is no longer necessary for the State to produce "[a]n actual therapist's report indicating non amenability [to sexual deviancy treatment] if there are other objective indications showing that the defendant is not a likely candidate for successful rehabilitation." State v. McNallie, 123 Wash.2d 585, 591, 870 P.2d 295 (1994). The State persuasively argues that Cannon's commission of a rape within two months of being required to undergo deviancy treatment is the kind of objective indicator contemplated by McNallie. In our view, the trial court did not err in concluding that Cannon acted with deliberate cruelty and poses a future danger.

*1304 D. Exceptional Sentence not Clearly Excessive
Lastly, Cannon argues that even if an exceptional sentence was justified, ordering the sentence for first degree rape to run consecutively to the 97 ½ month sentence for attempted second degree rape was clearly excessive because it is within the standard range sentence that a person with his offender score would receive upon conviction for murder in the second degree and other crimes that have a greater seriousness level rating than rape in the first degree.[8]
Cannon's argument is wholly unpersuasive. "A sentence will be deemed clearly excessive only if the trial court abused its discretion in fixing the duration of the sentence." State v. Farmer, 116 Wash.2d 414, 432, 805 P.2d 200, 13 A.L.R. 5th 1070 (1991). An abuse of discretion occurs when a trial court's decision is based on untenable grounds or is manifestly unreasonable. Havens v. C & D Plastics, Inc., 124 Wash.2d 158, 168, 876 P.2d 435 (1994).
As we have discussed above, the trial court did not err in determining that Cannon acted with deliberate cruelty and poses a danger of committing another sexually motivated offense in the future. The trial court cited these factors in justifying the exceptional sentence above the standard range. We cannot say, in light of the record and the factors found by the court, that a sentence of the magnitude imposed was untenable or manifestly unreasonable. There was no abuse of discretion.
Affirmed.
DURHAM, C.J., and DOLLIVER, SMITH, GUY, JOHNSON, MADSEN and TALMADGE, JJ., concur.
NOTES
[1] The record includes an exhibit, a multi-tabbed notebook, that had been prepared by the Seattle Police Department (designated herein as SPD File), containing notes taken by investigating officers, reports from experts, correspondence, interview transcripts, etc.
[2] The reports and exhibits contained in the notebook identified in footnote one were among the items that the trial court considered.
[3] The standard range for Cannon's conviction for first degree rape is 72 to 96 months. For his conviction for second degree attempted rape of S.T., the standard range was 73 ½ to 97 ½ months. The standard range for the attempted rape conviction is greater than the range for his first degree rape conviction because the rape conviction was considered as an additional prior offense for the purposes of calculating Cannon's offender score for attempted rape.
[4] CrR 3.3(d)(8) provides, in relevant part, as follows:

"When a trial is not begun on the date set because of unavoidable or unforeseen circumstances beyond the control of the court or the parties, the court, even if the time for trial has expired, may extend the time within which trial must be held for no more than 5 days ... unless the defendant will be substantially prejudiced in his or her defense."
[5] Cannon has not claimed that the lapse of time between March 7, 1991, the date the trial court granted the last of the challenged continuances, and the date the case went to trial contributed to a violation of CrR 3.3.
[6] CrR 4.7 provides, in part, that "if at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order ..., the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, dismiss the action or enter such other order as it deems just under the circumstances." CrR 4.7(7)(i).

CrR 8.3 also authorizes the trial court to dismiss a criminal prosecution "in the furtherance of justice." CrR 8.3(b).
[7] RCW 9.94A.370(2) reads, in relevant part, as follows:

"In determining any sentence, the trial court may rely on no more information than is admitted by the plea agreement, or admitted, acknowledged, or proved in a trial or at the time of sentencing."
[8] Murder in the second degree is currently classified as a seriousness level XIII crime. Rape in the first degree is classified in seriousness level XI. RCW 9.94A.320.