[No. 65585-5. En Banc.]
Argued March 22, 2000. Decided May 24, 2001.

THE STATE OF WASHINGTON, *Respondent*, v. DWAYNE ANTHONY WOODS, *Appellant*.

564

566

568

*Dwayne A. Woods*, pro se.

*Paul J. Wasson II* and *Lenell R. Nussbaum*, for appellant.

*Steven J. Tucker, Prosecuting Attorney, and Kevin M. Korsmo, Deputy*, for respondent.

ALEXANDER, C.J. — A Spokane County jury found Dwayne Anthony Woods guilty of two counts of aggravated first degree murder, one count of attempted first degree murder, and one count of attempting to elude a police vehicle. Following a determination by the jury that there were insufficient circumstances to merit leniency, the trial court imposed the death penalty. Woods appeals to this court his convictions for aggravated first degree murder and attempted first degree murder, claiming that numerous errors occurred during the trial which justify a reversal of those convictions and the sentence for aggravated first degree murder.[1] We affirm the convictions and the death sentence.

## I. FACTS

On Friday, April 26, 1996, Telisha Shaver was "housesitting" at her aunt's trailer home in the Spokane Valley. Verbatim Report of Proceedings (VRP) at 3054. Telisha, who planned to stay the night at her boyfriend's home, agreed to

---

[1] Woods has not sought review of his conviction for attempting to elude a police vehicle.

let her sister, Venus, and Venus's friend, Jade Moore, spend the night at the trailer. Because Venus and Jade went out that evening, they did not arrive at the trailer home until approximately 1:45 A.M. on Saturday, April 27. Shortly thereafter, Venus and Jade's friend, Anica Nelson, came over to the trailer. The three women then proceeded to engage in conversation and consume alcohol. Eventually, Venus and Jade expressed a desire to contact Dwayne Woods. Venus, who had been dating Woods, indicated that she simply wanted to talk to him. Jade, on the other hand, expressed the hope that Woods could supply her with marijuana. Eventually, Venus called Woods's pager number. Woods responded to the page at 3:45 A.M. Venus then agreed to pick him up in her automobile and bring him back to the trailer. At about this same time, Anica Nelson departed the trailer home and Jade went to sleep in one of the bedrooms of the trailer.

Venus returned to the trailer with Woods at 4:20 A.M. Although Venus and Woods proceeded to engage in conversation, Venus said that she felt "uneased about him. I wasn't comfortable." VRP at 3426. According to testimony Venus gave at trial, Woods "poured himself vodka" and expressed unhappiness about the fact that Jade was not awake. VRP at 3427. At the behest of Woods, Venus tried to awaken Jade, but she did not respond. Woods, according to Venus, became irate and eventually shoved Venus onto the couch and attempted to unbutton her pants. Venus said that she escaped from Woods's grasp but that he managed to grab her again and "slammed" her head and neck against a door. VRP at 3432. From that point on, Venus has no memory of events that morning except for reoccurring "flashing" of memory in which she recalls struggling with Woods. VRP at 3434.

After Woods completed his attack on Venus, he moved on to Jade. At about 7:30 A.M., Woods climbed into bed with Jade and forced her, at knifepoint, to get up. He then forcibly took her to witness the severely beaten Venus who was lying unconscious on the floor in one of the bedrooms.

Woods proceeded to threaten Jade that if she did not comply with his demands, she would "end up looking just like your friend Venus." VRP at 2941. He then forced Jade to help him loot the trailer and to give him her automatic transaction machine (ATM) card together with her personal identification number. He then raped Jade orally and vaginally.

While Woods was attacking Jade, Telisha came over to the trailer to retrieve some of her belongings. As she entered the trailer, Woods seized and bound her and forced her to stand against a wall in the bedroom. Jade, who was lying on the floor at this point, and "acting like she was dead," said that she "heard a baseball bat hit" Telisha's head. VRP at 3303. Jade was then hit in the head with the bat, knocked unconscious, and was unable to observe what happened beyond that point.

When Telisha failed to return home later that morning, her mother, Sherry Shaver, became concerned and decided to go to the trailer. She arrived there at approximately 10:25 A.M. and found the door locked. While peering in through a window in the trailer, she saw a man, whom she later identified as Woods, alighting from the other side of the trailer. Sherry gave chase, but the man she had observed eluded her. She then returned to the trailer and pounded on the locked door. Finally, Jade answered the door. According to Sherry Shaver, Jade "looked out of it and she was stark naked." VRP at 3063. Sherry soon realized that the three women in the trailer had been beaten. Sherry called 911.

Police, paramedic, and fire department personnel were immediately dispatched to the scene of the crime, and the victims were rushed to the hospital. While en route to the hospital, Jade told a paramedic about the events surrounding her assault. Once Jade arrived at the hospital she also informed her father, the emergency room physician, and a nurse about what had transpired that morning. Despite the efforts of hospital personnel, Telisha expired without ever regaining consciousness. Jade initially responded favorably to medical treatment, however, her condition eventually

worsened and she died the following day. Venus survived, despite being stabbed numerous times and severely beaten.

Soon after exiting the trailer, Woods was seen at two business establishments within close proximity to the crime scene. At one of the businesses, Woods obtained a ride from a patron into downtown Spokane. Shortly thereafter, and within close proximity to where Woods had been dropped off in downtown Spokane, a series of cash machine withdrawals occurred with the use of Jade's ATM card.

At approximately 12:30 P.M. that same day, Woods happened upon his brother-in-law, Louis Thompson, at a grocery store in the downtown area. Woods obtained a ride from Thompson to the home of Johnny Knight. Knight and his friend, Mary Knapp, recall that when Woods came to their home he offered at that time to sell Knight "some rings" and to buy one of Knight's automobiles. VRP at 5264. Woods passed the bulk of the day in their company, but later that evening went to the apartment of his former girl friend, Elizabeth Gerber, where he spent the night.

The following morning, April 28, 1996, Gerber asked Woods to leave her apartment. Woods became agitated and told Gerber that he was "a wanted man" and that she was "putting him on the streets." VRP at 5087. Later that day, Johnny Knight heard a television broadcast that indicated the authorities were searching for Woods. This prompted Knight to telephone the authorities and agree to lead them to Woods. With Knight's cooperation, Spokane County Sheriff deputies followed Knight as he went to pick up Woods and one of Woods's friends, Jennifer Espinoza. After Knight did so, the deputies stopped Knight's vehicle. When Knight exited the vehicle, Woods maneuvered his way into the driver's seat and sped away in the vehicle. The deputies gave chase, eventually bringing Woods to a halt. Woods was then taken into custody and was interrogated by Spokane County sheriff detectives.

Woods told the interviewing detectives that he ran from the police because he had a number of "outstanding traffic violations" and "some traffic warrants." VRP at 5371. Tes-

timony at trial indicated that at the time Woods was arrested, there were no outstanding traffic warrants for his arrest. Woods also told the detectives that he knew Venus Shaver but that he had not been in contact with her for about a week. Woods denied knowing a woman by the name of Jade. He also said that he had not been in the "Spokane Valley" for about a month and said that he had never visited a trailer home in the Spokane Valley. VRP at 5385. Finally, Woods told the detectives that there was no "logical explanation" for his fingerprints being found in a trailer home in the Spokane Valley. VRP at 5386.

## II. PRETRIAL PROCEEDINGS

Approximately one month after the above described events took place, the State charged Woods in Spokane County Superior Court with two counts of aggravated first degree murder, one count of attempted first degree murder, and, in the alternative, one count of first degree assault. At his arraignment on May 30, 1996, Woods pleaded not guilty to the charges and waived his right to be tried within 60 days of his arraignment, but not later than November 12, 1996. A trial date was set for October 21, 1996. On June 27, Woods's attorneys[2] moved to extend the time in which the prosecutor had to file notice of intent to seek the death penalty pursuant to RCW 10.95.040. Clerk's Papers (CP) at 32. They indicated that they did so in order to obtain additional time to prepare mitigating information in an effort to convince the prosecutor that the death penalty was inappropriate. The trial court extended the death penalty filing deadline until August 16, 1996.

On August 16, the State filed a notice that it intended to seek the death penalty. On August 23, Woods's attorneys moved for a continuance of the trial date. Their motion was based on the fact that the results of DNA (deoxyribonucleic acid) tests performed by the State had not been received

---

[2] Woods had been appointed counsel from the Office of the Spokane County Public Defender.

and that additional time was needed to produce mitigation evidence. Woods's counsel claimed that they would be unable to ensure that the defendant could receive a fair trial if required to go to trial on the scheduled date of October 21. Woods indicated to the trial court that he disagreed with his counsel, stating that he would "be prepared to proceed with—with this matter here without counsel come October 21st." VRP at 13. The trial court granted his attorneys' motion and reset the trial for March 17, 1997. Its ruling was predicated on the assumption that the DNA test results would be available to the defense by October 1, 1996.

On September 6, 1996, the prosecuting attorney filed a motion to amend the information to add the aggravating factor of "multiple victims" and an additional allegation that Woods eluded the police as part of "the total circumstances and offenses in this case." CP at 64.[3] The motion was granted and on September 13, 1996, Woods was arraigned on the amended charges. He again pleaded not guilty. The prosecution did not, however, file another notice of special sentencing at or after this arraignment.

Thereafter, another deputy prosecutor was assigned to represent the State. At a hearing on October 16, the newly assigned deputy prosecutor informed the trial court that "blood evidence" had not yet been sent to the Washington State Crime Laboratory for DNA testing. VRP at 67. He did, however, assure the trial court that the results from the testing of the blood would be received by January 1, 1997. Based on this assurance, the trial court entered an order stating that "the prosecution shall disclose DNA test results to the defense by 1-1-97." CP at 105. During a hearing on October 24, the same deputy prosecutor informed the court that a vial of Woods's blood had been "frozen" and that the State would, therefore, need a new blood sample for testing purposes. Woods objected to providing a new sample and renewed his objection to having the trial commence no later

---

[3] The State had earlier amended the information to add an additional count of attempting to elude a police vehicle.

than the original trial date, October 21. The trial court overruled both objections.

By January 2, 1997, one of two DNA test results had been obtained from the State Crime Laboratory. It showed that Woods was not the source of semen found in Telisha's body. At a hearing on January 13, 1997, the deputy prosecutor informed the trial court that the test of Woods's blood sample was not yet completed because it required a more complex and elaborate testing procedure than initially contemplated. The deputy prosecutor also informed the trial court that even after the blood was sent to the crime lab for DNA testing the delay in testing was exacerbated further because the laboratory scientist "went on Christmas vacation for a week or two." VRP at 116. He indicated that, as a consequence, the second set of DNA tests would not be completed until the middle of February 1997. Woods's counsel then moved to exclude admission of the DNA evidence because the results had not been provided to the defendant by the date established by the trial court, January 1, 1997. Woods's counsel also moved to dismiss the case due to prosecutorial mismanagement. The trial judge denied these motions.

Woods's counsel also sought an order prohibiting the State from seeking the death penalty for the reason that the prosecutor had not filed a written notice of a special sentencing after Woods was arraigned on the amended information. This motion was also denied. Woods's attorneys then moved, over Woods's objection, to continue the trial date, indicating that they could not provide "adequate representation" if the case proceeded to trial on March 17, 1997. CP at 172. Woods's attorneys informed the trial court that their heavy "caseload" prevented them from being prepared to represent Woods if the case were to proceed to trial in March. CP at 173. They also indicated that the DNA issues could not be "adequately addressed" because the State's delay in producing the DNA test results made it "difficult, if not impossible, to even begin to undertake a defense theory." CP at 178. The trial court granted the

motion and ordered the trial to commence on May 19, 1997.

On the eve of trial, the trial court conducted a CrR 3.5 hearing to determine the admissibility of the statement that Woods had given to the sheriff detectives on the day of his arrest. The trial court ruled that the statement was admissible at trial.

## III. GUILT PHASE OF THE TRIAL

Opening statements commenced on June 11, 1997. Thereafter, testimony was presented that was consistent with the above factual summary. It included testimony from a paramedic, Carol Ragland-Stone, who testified over the objection of Woods as to what Jade said to her in the ambulance on the way to the hospital. In addition, Jade's father, Barry Moore, was allowed to testify, over Woods's objection, as to what Jade had told him at the hospital on the morning of the attack. The trial court allowed Dr. Edminster to testify, also over Woods's objection, as to what Jade told him with respect to Telisha's attack. Finally, an emergency room nurse, Diane Bethel, was allowed to testify as to what Jade told her during a rape examination that was conducted shortly after Jade arrived at the hospital. In addition, a forensic scientist who performed the DNA testing, John Brown, Ph.D., testified that the sperm recovered from Jade was determined to contain the DNA of Woods. Brown testified that the odds of a random match in the African-American population, which included Woods, were 1/125,000,000. A fingerprint expert, Dorothy Blyton, testified for the State and indicated that Woods's fingerprints were found on a vodka bottle and a telephone, both of which were found in the trailer at which the assault and homicides took place. There was also evidence that Woods's coat and shirt were found at the scene of the crime. Paging and telephone records, which were admitted into evidence, revealed that Woods's pager had been called several times from the scene of the crime during the early hours of Saturday, April 27, 1996.

Finally, testimony was presented regarding the brutality of the crime. Lieutenant Terence Gese, a 21-year veteran of the Spokane Valley fire paramedics division testified "[t]hat someone had perpetrated some of the worst violence I have ever seen." VRP at 3098. A Spokane Valley fire station captain, Gerald Johnson, testified that in the bedroom where the victims were found "[i]t was something I had never seen before." VRP at 3127. He said that blood was "everywhere" and that "[i]t looked like someone had taken a paint brush and just splattered it all over the place." VRP at 3130.

Woods did not testify. The defense theory was that Woods could not have murdered Telisha and Jade or assaulted Venus because he was dining at a bar in downtown Spokane at the time the crimes occurred. In support of this defense, the testimony of a bartender was offered to the effect that Woods had been served that morning at the bar at which the bartender was employed.

Following closing arguments on Friday, June 20, the jury found Woods guilty of two counts of aggravated murder, one count of attempted murder, and one count of attempting to elude police officers. As Woods was being escorted from the courtroom he informed some journalists that he would not challenge the death penalty. This occurred outside the hearing of the jury.

Over the ensuing weekend, Woods instructed his lawyers not to present any mitigating evidence at the penalty phase of the trial. Concerned that Woods was not thinking rationally as a result of the unfavorable verdict, his attorneys sought a continuance of the penalty phase of the trial in order to give them time to have Woods's mental capacity assessed. The trial court denied their motion and ordered the sentencing phase of the trial commence that afternoon.

## IV. PENALTY PHASE

The State presented victim impact testimony from Telisha Shaver's mother, Sherry Shaver, and Jade Moore's

father, Barry Moore. The State also presented in-life photos of the two murder victims as well as certified judgments of the defendant's three prior second degree assault convictions. As per Woods's instructions, his counsel did not present any mitigating evidence. Defense counsel did, however, inform the trial court that they had planned to call several witnesses to present mitigation testimony: Dwayne Woods's parents, Janet and Emanuel Hunter; Woods's sister, Bev Thompson; Woods's nephew, Willie Lyons; Dr. Amy Paris of Spokane; Dr. Murial Lesack of Portland; and Anna Cowles of Spokane. When Woods exercised his right of allocution, he made the following statement to the jury:

> Well, ladies and gentlemen, you heard from [the prosecutor] and so you know that he's asking that you impose the death penalty. I just want to say that I have no objection. Also, I just want to remind you that a few weeks back during individual voir dire each of you was asked if you could, in fact, impose the death penalty. I believe at that time each of you said you could impose the death penalty providing there's not sufficient mitigating circumstances.
>
> So I am here to tell you there's absolutely none, not one. So I ask that each of you go back and return a vote to impose the death penalty. Thank you.

VRP at 5774.

After deliberating for two days, the jury found that there were insufficient mitigating circumstances to merit leniency. The trial court thereafter imposed the death penalty.

## V. ANALYSIS

### A. Pretrial Procedure

#### 1. Continuances

Woods contends that the trial court erred in twice continuing his trial date over his objections. Woods stresses that under CrR 3.3, he was entitled to be brought to trial on

or before November 12, 1996. Because the continuances resulted in Woods going to trial after that date, he argues, the trial court failed to comply with the rule and his challenged convictions should be reversed and the charges dismissed. The State responds that the trial court properly exercised its discretion in continuing the trial date, even over Woods's objections.

CrR 3.3(c)(1) provides, in pertinent part, that "[a] defendant not released from jail pending trial shall be brought to trial not later than 60 days after the date of arraignment." Because Woods's arraignment occurred on September 13, 1996, Woods initially had the right to be tried on or before November 13, 1996. The right to be tried within 60 days after arraignment, however, is not absolute because a trial court may continue a criminal trial "when required in the administration of justice and the defendant will not be substantially prejudiced in the presentation of the defense." CrR 3.3(h)(2). A continuance granted pursuant to CrR 3.3(h)(2) is "excluded in computing the time for arraignment and the time for trial." CrR 3.3(g)(3).

We have observed on several occasions that "a . . . grant or denial of a motion for continuance will not be disturbed absent a showing of manifest abuse of discretion." *State v. Campbell*, 103 Wn.2d 1, 14, 691 P.2d 929 (1984). A continuance granted by the trial court is an abuse of discretion only if it can be said that the decision was " 'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.' " *In re Det. of Schuoler*, 106 Wn.2d 500, 512, 723 P.2d 1103 (1986) (quoting *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)). The issue before us, then, is whether the trial court acted in a manifestly unreasonable manner when it continued the trial, first from October 21, 1996, to March 17, 1997, and second from March 17, 1997, to May 19, 1997.

The first continuance was authorized by the trial court at a hearing on August 30, 1996. At that hearing, Woods's attorneys expressed the view that they would need up to four months to complete their own testing of the DNA

evidence once they received the results from the State's tests.[4] In considering its decision, the trial court inquired as to when the State submitted its DNA material for analysis. The deputy prosecutor then assigned to the case responded as follows:

> The lab tests were submitted by the detectives some time, I believe the end of July, early August. But I talked to Mr. Ward last week, he was able to tell me all tests would be completed by the end of September because he specifically asked about a trial date. And I told him I needed them by October 1st, and he said that would be no problem.

VRP at 29. Based on the statement of Woods's attorneys that they needed four months to complete their own DNA testing as well as the prosecutor's statement to the effect that the State's testing would be completed by October 1, the trial court established a new trial date of March 17, 1997.

It is clear to us that the trial court did not wield its discretion in an abusive manner when it continued the trial from October 21, 1996, to March 17, 1997. If it had required Woods to go to trial in October, justice could well have been thwarted because the results of the State's DNA testing were not due to be handed over to the defense until October 1—a mere three weeks before the trial was set to commence. Based on the information the trial court had before it, it was reasonable for the court to conclude that a mere 21 days would not have been enough time for the defense to review the State's test results or obtain an independent analysis of the DNA evidence. We are satisfied, in short, that it was reasonable for the trial court to conclude that an October trial would have prevented Woods's counsel from being fully prepared to deal with the DNA evidence amassed by the State.

It is apparent, also, that Woods was not prejudiced in any

---

[4] One of Woods's attorneys explained that four months was needed because the defense would first need to complete a "thorough analysis of the State's test first." VRP at 30. He opined that once that test was completed, "there is a second request for our own independent testing that may or may not be made at that time." VRP at 30. Each test, he submitted, would take approximately two months to complete.

substantial way by the continuance. In fact, as the trial court noted, the continuance until March "would allow the defendant an opportunity to present evidence that wouldn't otherwise be available." VRP at 31. In sum, we believe that the trial court did not abuse its considerable discretion in granting the first continuance that Woods's counsel requested.

For similar reasons, we are satisfied that the trial court did not err in continuing the trial date a second time from March 17 to May 19. As noted above, this continuance was necessitated by the State's "significant delay" in its handling of the DNA evidence as well as the heavy "caseloads" being handled by Woods's counsel. CP at 178, 173. When looking at the events through the same prism as the trial court, we are satisfied that it was reasonable for the court to grant the requested continuance. We reach that conclusion because Woods could have been confronted with damaging DNA evidence and his attorneys would neither have had an opportunity to conduct their own inquiry with respect to the State's tests nor would they have had time to engage in their own testing. Moreover, had the trial commenced in March, Woods would have been placed in the difficult position of having representation from counsel all of whom indicated that "adequate representation" could not be provided if the trial commenced on March 17, 1997. CP at 172.

In short, we are loath to find that the trial court acted in a manifestly unreasonable fashion by refusing to require a defendant charged with a capital offense to proceed to trial without affording his counsel an adequate opportunity to explore the State's scientific evidence. We are also reluctant to hold that the trial court acted for untenable reasons when it delayed the trial to ensure that Woods would receive adequate representation from his public defenders. We conclude, therefore, that the trial court did not abuse its discretion in granting the second continuance of the trial date.

## 2. Prosecutorial Mismanagement

Woods next contends that the trial court erred in denying his motion to dismiss the charges against him for what he claims was "[t]he prosecutor's lack of due diligence." Br. of Appellant at 73. More specifically, he claims here, as he did at trial, that the trial court should have dismissed the charges because the State made "material misrepresentations" that "caused or substantially contributed to the delays in bringing this case to trial." Br. of Appellant at 74. The State counters that the trial court acted correctly in refusing to dismiss the case against Woods.

██ A trial court is given wide latitude in granting or denying a motion to dismiss a criminal prosecution for discovery violations. *See State v. Hanna*, 123 Wn.2d 704, 715, 871 P.2d 135, *cert. denied*, 513 U.S. 919 (1994). This court will not disturb the trial court's denial of the motion to dismiss unless we find that the denial constitutes a manifest abuse of discretion. *Id.* We have also announced on several occasions that " ' "dismissal of charges is an extraordinary remedy available only when there has been prejudice to the rights of the accused which materially affected his or her rights to a fair trial." ' " *State v. Blackwell*, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993) (quoting *City of Spokane v. Kruger*, 116 Wn.2d 135, 144, 803 P.2d 305 (1991) and *City of Seattle v. Orwick*, 113 Wn.2d 823, 830, 784 P.2d 161 (1989)).

██ Woods asserts that under our decision in *State v. Price*, 94 Wn.2d 810, 620 P.2d 994 (1980), a dismissal of the charges is mandated. Pertinent to the issue before us, we stated in *Price* that:

> [I]f the State inexcusably fails to act with due diligence, and material facts are thereby not disclosed to defendant until shortly before a crucial stage in the litigation process, it is possible either a defendant's right to a speedy trial, or his right to be represented by counsel who has had sufficient opportunity to adequately prepare a material part of his defense, may be impermissibly prejudiced. Such unexcused conduct by the

State cannot force a defendant to choose between these rights. *The defendant, however, must prove by a preponderance of the evidence that interjection of new facts into the case when the State has not acted with due diligence will compel him to choose between prejudicing either of these rights.*

*Price*, 94 Wn.2d at 814 (emphasis added). Thus, before a trial court should exercise its discretion to dismiss a criminal prosecution, a defendant must prove that it is more probably true than not true that (1) the prosecution failed to act with due diligence, and (2) material facts were withheld from the defendant until shortly before a crucial stage in the litigation process, which essentially compelled the defendant to choose between two distinct rights. We discuss each of the *Price* criteria in the context of this case.

There is little question that the State's actions with respect to its handling of the forensic DNA evidence constituted a lack of due diligence. In that regard, the record reflects that in August 1996 the deputy prosecutor informed the trial court that the State's DNA testing would be completed by October. As it turned out, the State did not complete its testing of all of the DNA evidence until February 1997. While it is not entirely clear from the record precisely why the delay of four months occurred, what is clear from the record is that the State's inadvertent freezing of Woods's blood, coupled with the delay associated with the vacation of a forensic scientist at the crime laboratory, had a substantial influence on the delayed production of the DNA test results. While this delay cannot be attributed to counsel for the State it is clear that conduct of employees of the crime laboratory, which is lacking in due diligence, constitutes actions on the part of the State. *See State v. Wake*, 56 Wn. App. 472, 475, 783 P.2d 1131 (1989) (observing that actions of the employees of crime lab are considered actions of the State).

Although we express our dismay at the State's dilatory conduct, we do not believe that the trial court acted in a manifestly unreasonable manner by refusing to dismiss the charges in this case. As noted above, it was incumbent on

Woods to show by a preponderance of the evidence that the State's lack of due diligence forced him into choosing between salvaging one constitutional right at the expense of another constitutional right. Indeed, under *Price* and its progeny, lack of diligence by the State, standing alone, is not a sufficient basis for dismissal of criminal charges. The State's delay must also be accompanied by an interjection of "new facts" into the case which then causes the defendant to choose between two constitutional rights. *See Price*, 94 Wn.2d at 814; *see also State v. Michielli*, 132 Wn.2d 229, 937 P.2d 587 (1997). For example, in *Michielli*, the prosecutor obtained amendment of the information just days before trial was set to begin, even though the prosecutor knew months before that there was evidence that supported the additional charges. We held there that the "[d]efendant was prejudiced in that he was forced to waive his speedy trial right and ask for a continuance to prepare for the surprise charges brought three business days before the scheduled trial." *Michielli*, 132 Wn.2d at 244.

Here, there were no new facts that were injected into the proceeding as a result of the State's delay in producing the test results. Our previous decision in *State v. Cannon*, 130 Wn.2d 313, 922 P.2d 1293 (1996) is instructive on this precise issue. In *Cannon*, the defendant claimed that the case against him should have been dismissed because the State mishandled the first sample of his blood and was slow in producing the results from the DNA tests on his blood. We rejected Cannon's argument that he was prejudiced by the State's dilatory actions because Cannon's counsel was "placed on notice from the time of charging that the State intended to introduce scientific evidence relating to blood samples . . . in order to tie Cannon to the crime." *Cannon*, 130 Wn.2d at 329. Thus, we concluded that no new facts came to light as a result of the State's tardy production of the DNA test results. *Id.* at 329. The situation here is similar in that the State's delay in producing the DNA test results did not cause the interjection of new information into the case. Like the defendant in *Cannon*, Woods was

placed on notice from the time of the charging that the State intended to use the results from forensic testing to prove that Woods was the ·perpetrator of the crimes. Although the State did not produce test results as promptly as it initially indicated that it would, the test results which were produced did not constitute new evidence that forced Woods to choose between two constitutional rights.[5]

Although we are satisfied that the State's delay in producing the DNA test results evidences a lack of due diligence, nothing in the record indicates that new facts were interjected into the trial proceeding as a result of the delays that occurred. Consequently, Woods was not forced to choose between two constitutional rights, and, therefore, the trial court did not abuse its discretion in denying Woods's motion to dismiss.[6]

### 3. Right to Proceed Pro Se

 Woods next contends that the trial court denied him his right to act as his own attorney, "proceed pro se," and that his conviction should, therefore, be overturned and a new trial granted.[7]

 Criminal defendants have a federal and state constitutional right to waive assistance of counsel and represent themselves. *See Faretta v. California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); *State v. Bebb*, 108 Wn.2d 515, 524, 740 P.2d 829 (1987). Indeed, the unjustified

---

[5] Even if the DNA results had been produced by the court-ordered date of January 1, it is not completely clear that Woods's counsel would have been able to proceed to trial in March. We say that because two of Woods's attorneys indicated in certificates to the trial court that their respective "caseloads" were such that they would be unable to proceed to trial in March. CP at 173-78.

[6] The trial court could have imposed other sanctions against the State for the delay. *See* CrR 4.7(h)(7)(i) (outlining sanctions that can be imposed for failing to "comply with an applicable discovery rule or an order issued pursuant thereto"). Nothing in the record, however, indicates that any other sanctions were sought or imposed.

[7] This issue was not raised by Woods at the trial court. The State has not objected to Woods raising this issue for the first time on appeal, apparently because this is an issue of constitutional magnitude that can be raised for the first time on appeal. *See* RAP 2.5(a)(3).

denial of this right requires reversal. *State v. Breedlove*, 79 Wn. App. 101, 111, 900 P.2d 586 (1995). We have previously noted, however, that the right to self-representation is not self-executing. *State v. DeWeese*, 117 Wn.2d 369, 377, 816 P.2d 1 (1991). Accordingly, a criminal defendant's request to proceed pro se must be (1) timely made and (2) stated unequivocally. *State v. Stenson*, 132 Wn.2d 668, 737, 940 P.2d 1239 (1997).

The State does not suggest that Woods's request was untimely. The focus of our inquiry, therefore, is on whether the claimed request to proceed pro se was unequivocal. The defendant's request to proceed pro se must be unequivocal in the context of the record as a whole. *State v. Luvene*, 127 Wn.2d 690, 698-99, 903 P.2d 960 (1995). Our previous discussion in *Luvene* is telling as to what type of statement on the part of the defendant constitutes an "unequivocal" request to proceed without the benefit of counsel. There, the defendant objected to the trial court granting his counsel's motion for a continuance. On appeal, the defendant argued that he was denied his constitutional right to proceed pro se based on his statement to the trial court:

> [THE DEFENDANT:] "I've been here since July. . . . You know, I don't wanna sit here any longer. It's me that has to deal with this. If I'm prepared to go for myself, then that's me. You know, can't nobody tell me what I wanna do. They say I did this, so why not—if I wanna go to trial, why can't I go to trial on the date they have set for my life? I'm prepared. I'm not even prepared about that. I wanna go to trial, sir. . . .
>
> "I don't wanna extend my time. This is out of my league for doing that. I do not want to go. If he's not ready to represent me, then forget that. But I want to go to trial on this date."

*Luvene*, 127 Wn.2d at 698 (quoting Report of Proceedings at 72-73). Taken in the context of the record as a whole, we determined that the above-quoted statement could be seen only as an "expression of frustration by Mr. Luvene with the delay in going to trial and not as an unequivocal assertion of his right to self-representation." *Luvene*, 127 Wn.2d at 699.

Woods's statement to the trial court was as equivocal as was Luvene's statement. The statement was made at a hearing on August 23 and was as follows:

[DEFENSE COUNSEL]: . . . . I think the only effective date we can ask for right now is the 5th of May of '97.

THE DEFENDANT: Your Honor, you know, I will be — I will be prepared to proceed with — with this matter here without counsel come October 21st.

THE COURT: All right. You understand you have the right to do that.

THE DEFENDANT: Yes.

THE COURT: Counsel, have you discussed this with your client?

[DEFENSE COUNSEL]: No. We have not discussed that point at all. It's a surprise to me.

THE DEFENDANT: I've — I've already consented to one continuance, Your Honor. And they—they have done nothing but grossly misuse that time there. And I feel if — if they was [sic] granted a second continuance, it — it would be treated in the same manner, Your Honor.

THE COURT: All right. Thank you.

VRP at 13-14.

Woods's statement cannot be viewed as an unequivocal statement of his desire to proceed to trial pro se. His statement, like that which we examined in *Luvene*, merely revealed the defendant's displeasure with his counsel's request to continue the trial for a lengthy period of time. Woods, like the defendant in *Luvene*, was undoubtedly frustrated by the delay, and his statement to the trial court appears to have been an expression of those feelings.

 Woods also argues that the trial court failed to "engage in the proper colloquy with Mr. Woods regarding his request to represent himself." Br. of Appellant at 82. We do not believe the trial court was required to engage in such colloquy because Woods did not make an unequivocal request to represent himself. Had Woods made such a request

the trial court would then be required to apprise the defendant of (1) the nature of the charge, (2) the possible penalties, and (3) the disadvantages of self-representation. *See United States v. Balough*, 820 F.2d 1485, 1487 (9th Cir. 1987).

■■■ We are satisfied that telling a trial judge he "will be prepared to proceed without counsel" is qualitatively different from telling a judge that one wishes to proceed pro se. Woods's comment was in the former category and was not an expression of an unequivocal desire to represent himself. We conclude, therefore, that he was not denied his constitutional right to proceed pro se and is not entitled to a new trial on that basis.

### 4. Notice of Death Penalty

Woods next argues that the trial court erred in failing to "dismiss the special sentencing proceedings and death penalty" because of the State's failure to adhere to the dictates of RCW 10.95.040, the statute that outlines the procedures the State must follow in order to seek the death penalty. CP at 703. Woods claims that this error entitles him to a new trial at which the State would be precluded from seeking the death penalty.[8]

The pertinent portion of the aforementioned statute is as follows:

(1) If a person is charged with aggravated first degree murder as defined by RCW 10.95.020, the prosecuting attorney shall file written notice of a special sentencing proceeding to determine whether or not the death penalty should be imposed when there is reason to believe that there are not sufficient mitigating circumstances to merit leniency.

(2) The notice of special sentencing proceeding shall be filed and served on the defendant or the defendant's attorney within

---

[8] Woods asserts that the remedy for the claimed error "is not merely vacation of the death penalty." Br. of Appellant at 87. He asserts that death-qualified juries are significantly "more likely to vote for guilt" than nondeath qualified juries. *Id.* Because his jury was "death qualified," he argues, he is entitled to a new trial on the issue of his guilt.

thirty days after the defendant's arraignment upon the charge of aggravated first degree murder unless the court, for good cause shown, extends or reopens the period for filing and service of the notice. . . .

(3) If a notice of special sentencing proceeding is not filed and served as provided in this section, the prosecuting attorney may not request the death penalty.

RCW 10.95.040.

Woods asserts that pursuant to this statutory language the prosecuting attorney had 30 days from the date of his arraignment on the amended information to file a written notice of the State's intention to seek the death penalty. Because the deputy prosecutor did not file and serve this notice within this time frame, Woods claims, the death penalty could not be sought or the penalty imposed.

▮ We do not believe that the State was required to file a second notice of its intention to seek the death penalty after Woods's arraignment on the amended information. We say that because, as we have observed previously, the purpose underlying the statutory notice requirement embodied in RCW 10.95.040 is to apprise "the accused of the penalty that may be imposed upon conviction of the crime." *State v. Clark*, 129 Wn.2d 805, 811, 920 P.2d 187 (1996). We have also observed that this notice requirement of RCW 10.95.040 "applies by its terms only to the prosecutor's original decision to seek the death penalty." *State v. Rupe*, 108 Wn.2d 734, 740, 743 P.2d 210 (1987).

After Woods was initially charged with aggravated first degree murder, the prosecution indicated its decision to seek the death penalty by filing a timely notice, pursuant to the above-quoted statute. Woods was on notice from that date forward that the State would seek imposition of the death penalty if it obtained a conviction for aggravated first degree murder. We do not believe that the filing of an amended information diminished or called into question that original decision. In fact, the filing of the amended information, if anything, affirmed the State's original intention because it added an additional aggravating factor of

"multiple victims" and incorporated an additional allegation that Woods eluded the police as part of the "total circumstances and offenses in this case." CP at 64.

The notice procedures embodied in RCW 10.95.040 exist to ensure that the defendant is fully apprised that the death penalty is being sought and that it is the punishment that may ultimately be exacted. We are satisfied that the State complied with these procedures when it timely filed the statutorily mandated notice after Woods's first arraignment. Under the circumstances before us, it was not required to file another notice after Woods's rearraignment on the amended information.[9] The trial court did not, therefore, err in denying the defendant's motion to dismiss the special sentencing proceeding and death penalty.

## B. Guilt Phase Trial Errors

### 1. Trial Court's Oral Instruction

Woods contends here that the trial court violated his right to due process and impermissibly commented on the evidence by instructing the jury at the outset of the guilt phase of the trial about procedures that would take place during the penalty phase of the trial. He asserts that, because of these comments, he is entitled to a new trial.

This court reviews alleged instructional errors under a de novo standard of review. *See State v. Benn*, 120 Wn.2d 631, 654-55, 845 P.2d 289, *cert. denied*, 510 U.S. 944 (1993). In assessing whether the trial court presented the jury with an erroneous instruction, we evaluate the allegedly erroneous instruction "in the context of the instructions as a whole." *Benn*, 120 Wn.2d at 654-55. Furthermore, in evaluating the comments of the trial judge, we take note of the fact that trial court judges are forbidden from

---

[9] We can imagine a case where the filing of an amended information might cast doubt on the prosecutor's original decision to seek the death penalty. For example, if an amended information eliminated an aggravating factor that was set forth in the original information, it may be reasonable to conclude that the prosecutor's original decision is in question and a new notice need be filed.

commenting upon the evidence presented at trial. *See* WASH. CONST. art. IV, § 16. "An impermissible comment is one which conveys to the jury a judge's personal attitudes toward the merits of the case . . . ." *State v. Swan*, 114 Wn.2d 613, 657, 790 P.2d 610 (1990), *cert. denied*, 498 U.S. 1046 (1991). A jury instruction that does no more than accurately state the law pertaining to an issue, however, does not constitute an impermissible comment on the evidence by the trial judge. *See Hamilton v. Dep't of Labor & Indus.*, 111 Wn.2d 569, 571, 761 P.2d 618 (1988). With these legal concepts in mind, we turn to Woods's arguments.

■ Woods assigns error to the following preliminary instruction that the trial judge read to the jury at the beginning of the guilt phase of the trial:

> During the sentencing phase proceedings you may hear additional evidence. You will hear additional argument concerning the penalty to be imposed and you will then retire to determine whether or not the death penalty should be imposed or whether punishment should be life imprisonment without the possibility of release or parole and in the making of this determination you will be asked the following question: Having in mind the crime with which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are no such mitigating circumstances to merit leniency. And if you unanimously agree yes to this question, the sentence will be death. If you do not unanimously answer yes or if you unanimously answer no, the sentence will be life imprisonment without the possibility of release or parole.

VRP at 3013-14; Br. of Appellant at 1-2. Woods fails to call our attention to all of the trial judge's opening remarks to the jury. In our view, it is necessary for us to analyze them in their entirety. *See Benn*, 120 Wn.2d at 655. Immediately before the trial court made the comments to the jury to which Woods objects, it made the following statement to the jury:

> THE COURT: Good morning. Please be seated. All Right.
>
> I want to remind you that you have been previously sworn. We have given you certain instructions with respect to this

case. I am going to add some more.

We all know because we have been told that the laws of the state of Washington establish a two phase procedure for determining whether or not the death penalty in a case such as this would be imposed, and we have talked about that process. *This is the first phase of the trial, the first phase in which you must decide whether the State has proven the charge of premeditated first degree murder with aggravating circumstances and the other charges beyond a reasonable doubt.*

*Now just so you understand, if a defendant is found not guilty of premeditated first degree murder with aggravating circumstances on both of these counts with which he is charged during the first phase, your service in this case will be completed at that point.* However, if the defendant is found guilty of the crime of premeditated murder in the first degree with aggravating circumstances on any count, then it will be—you will be reconvened for the second phase or the sentencing phase.

VRP at 3012-13 (emphasis added). We are satisfied that when all of the trial judge's remarks are read, it cannot be said that there is instructional error or any impermissible comment on the evidence. Viewed that way, it is clear that the judge was simply apprising the jury of the nature of a prosecution for aggravated first degree murder. To its credit, the trial court thoroughly and accurately explained the bifurcated nature of these kinds of cases. Contrary to Woods's argument, the trial court's statement to the jury did not imply that Woods was guilty of the charged crimes; rather, the trial court explicitly stated that if the defendant is found not guilty "your service in this case will be completed at that point." VRP at 3013. The trial court then continued and explained how the penalty phase of the trial would unfold but only, "*if* the defendant is found guilty of the crime of premeditated murder in the first degree with aggravating circumstances on any count." VRP at 3013 (emphasis added).

In short, we believe that the trial court's preliminary instruction was not improper and indeed was a reasonable and sensible method of providing a road map to the jury of what its responsibilities might be. We, therefore, reject

Woods's argument that the trial court's oral instruction to the jury was an impermissible comment on the evidence that constituted a denial of due process.

## 2. Jury Instructions

 Woods next assails the two jury instructions that the trial court provided to the jury regarding the alleged aggravating circumstances involved in counts I and II, the respective aggravated first degree murder charges. Woods claims that these instructions were weighted "in favor of finding the aggravating circumstances" and, therefore, violated Woods's right to due process and the aforementioned provision of the Washington Constitution that prohibits the court from "commenting on the evidence." Br. of Appellant at 99, 96. As noted above, this court engages in de novo review in assessing whether a jury instruction was legally deficient. *Benn*, 120 Wn.2d at 655. We also examine the challenged instruction against the backdrop of the jury instructions as a whole. *Id.*

The relevant portion of the challenged instructions state:

> You should consider each of the aggravating circumstances above separately. If you unanimously agree that a specific aggravating circumstance has been proved beyond a reasonable doubt, you should answer the special verdict "yes" as to that circumstance.

CP at 2631-32 (jury instructions 26 and 27). Woods claims that after the above paragraph, additional language should have been added to instruct the jury as to when it should answer "no" on the special verdict form.[10] Woods asserts that the instructions should have stated something to the effect that:

> If, on the other hand, you have a reasonable doubt as to a specific aggravating circumstance, you should answer the special verdict "no" as to that circumstance.

---

[10] Once again, the record does not reflect that Woods objected to these instructions at trial or excepted to the trial court's failure to include the additional language in the instruction.

Br. of Appellant at 99. Failure to include this statement in the instructions, argues Woods, requires "vacating . . . the sentences on Counts I and II." Br. of Appellant at 100.

We are satisfied that these instructions are free of constitutional infirmity. We say that because due process simply requires that the jury be instructed that the prosecution must establish its case "beyond a reasonable doubt," *In re Winship*, 397 U.S. 358, 361, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970), and that the defendant is "presumed innocent." *State v. McHenry*, 88 Wn.2d 211, 558 P.2d 188 (1977). Clearly, both instructions that are in question satisfy one of these requirements, the instructions informing the jury about the State's burden of "proving the existence of an aggravating circumstance beyond a reasonable doubt." CP at 2631-32. In addition, another jury instruction, instruction 3, provided general guidance to the jury and reinforced the principles that the defendant is without any burden of proving that a reasonable doubt exists and is presumed innocent throughout the entire trial.[11] CP at 2607. Moreover, at the very beginning of the guilt phase of the trial, the judge told the jury that the State must prove the "charges beyond a reasonable doubt" and further urged the jurors to "make a special effort to keep their minds open until the end of the case." VRP at 3013, 3018.

The challenged jury instructions were not, as Woods suggests, unfairly "weighted" against him. Br. of Appellant

---

[11] Instruction 3 is as follows:

"The defendant has entered a plea of not guilty, which puts in issue every element of the crime charged. The State, as plaintiff, has the burden of proving each element of the crime beyond a reasonable doubt. The defendant has no burden of proving that a reasonable doubt exists.

"A defendant is presumed innocent. This presumption continues throughout the entire trial unless you find during your deliberations that it has been overcome by the evidence beyond a reasonable doubt.

"A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. A reasonable doubt is a doubt that would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence." CP at 2607.

at 99. Rather, they succinctly articulated the elements that the prosecution was required to establish beyond a reasonable doubt. Moreover, another jury instruction and the trial court's preliminary remarks emphasized the nature and extent of the State's burden, further ensuring that due process was afforded to Woods. We do not believe that the constitution requires anything further.

### 3. Hearsay Testimony

Woods next contends that his constitutional right to confront witnesses against him was violated when the trial court admitted into evidence statements that Jade Moore made to several people before she died. He claims that the trial court incorrectly determined that these statements fell within either the "excited utterance" or "medical diagnosis" exception to the rule against the admission of hearsay evidence. Woods claims that as a result of the trial court's error, he is entitled to a new trial.

The confrontation clause of the United States Constitution precludes the admission of hearsay testimony offered against a criminal defendant unless that statement falls within one of the "firmly rooted" exceptions to the hearsay rule. *Idaho v. Wright*, 497 U.S. 805, 815, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990); *State v. Foster*, 81 Wn. App. 444, 915 P.2d 520 (1996). Both the "medical diagnosis" and the "excited utterance" exceptions are "firmly rooted" exceptions to the rule against hearsay. *See State v. Ackerman*, 90 Wn. App. 477, 484, 953 P.2d 816 (1998); *State v. Strauss*, 119 Wn.2d 401, 832 P.2d 78 (1992). The critical question for our consideration is whether the trial court erred in concluding that these statements were admissible under the rules of evidence. A trial court's determination that a statement is admissible pursuant to a hearsay exception is reviewed by this court under an abuse of discretion standard. *See State v. Gribble*, 60 Wn. App. 374, 381, 804 P.2d 634, *review denied*, 116 Wn.2d 1022 (1991). We will not, therefore, disturb the trial court's ruling unless we believe

that no reasonable judge would have made the same ruling. *Id.* We examine each of Jade's statements in light of these principles.

### a. "Excited Utterance" Testimony

While en route to the hospital, Jade made several statements to Carol Ragland-Stone, a paramedic who was treating Jade in the ambulance. In response to questions from the paramedic about "what happened," Jade said she was hit "with a baseball bat." VRP at 2900-01. In response to the paramedic's question, "who did it," Jade responded, "a man named Dwayne." VRP at 2902. Ragland-Stone was permitted to testify at trial about these statements and also testified that Jade told her that she was sexually assaulted by "the person that hit her with the bat." VRP at 2903.

When Jade's father arrived at the hospital, Jade told him that "around 7:30 [A.M.] she woke up to somebody holding a knife to her, jerked her out of bed, took her to another bedroom, showed her Venus, and said, 'if you don't do exactly what I say, I'm going—you are going to end up looking just like your friend Venus.'" VRP at 2941. He also testified that while recounting what happened "she would stop and she went back and she says, 'Dad, there was so much blood. There was blood everywhere.'" VRP at 2941. Jade also told her father that the assailant took her to Telisha and ordered Jade to, "'[c]ut her throat or I am going to kill you.'" VRP at 2942. The assailant, according to Jade, also insisted that Jade "help him go through . . . stuff in the closets," and he also took Jade's cash card and "forced her to give him her PIN number." VRP at 2944. Jade's father further testified that he asked "[d]id you know this person?" and Jade responded, "'[i]t was a guy that Venus had been going out with and his name was Dwayne.'" VRP at 2942.

Woods bases his argument that Jade's statements to Ragland-Stone should have been excluded at trial largely on a decision from Division Three of the Court of Appeals,

*State v. Sharp*, 80 Wn. App. 457, 909 P.2d 1333 (1996), and this court's decision in *State v. Chapin*, 118 Wn.2d 681, 686, 826 P.2d 194 (1992). Woods alleges that Jade's statements to her father should have been excluded pursuant to this court's decision in *State v. Brown*, 127 Wn.2d 749, 903 P.2d 459 (1995).

██ ██ An out-of-court statement offered to prove the truth of the matter asserted is admissible at trial if the statement relates to "a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." ER 803(a)(2). We have previously stated that three closely connected requirements must be satisfied in order for a hearsay statement to qualify as an excited utterance. First, a startling event or condition must have occurred. Second, the statement must have been made while the declarant was under the stress or excitement caused by the startling event or condition. Third, the statement must relate to the startling event or condition. *Chapin*, 118 Wn.2d at 686. Often, the key determination is whether the statement was made while the declarant was still under the influence of the event to the extent that the statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment. *State v. Strauss*, 119 Wn.2d 401, 416, 832 P.2d 78 (1992).

In *Sharp*, the trial court determined that a statement made by a 12-year-old boy to a police officer 30 to 40 minutes after the startling event was an excited utterance. The Court of Appeals reversed the trial court, concluding that the boy's statement was not admissible. In doing so, though, it failed to adhere to the traditional and deferential abuse of discretion standard. The Court of Appeals decided, instead, that "[t]he trial court . . . is in no better position than we are to evaluate the circumstances surrounding M.J.'s utterance." *Sharp*, 80 Wn. App. at 461. Because the court in *Sharp* failed to view the admitted testimony through the correct review lens, we believe that court's subsequent analysis is flawed and, thus, not instructive. *See State v. Briscoeray*, 95 Wn. App. 167, 171, 974 P.2d 912

(1999) (noting that *Sharp* analysis was incorrect because the abuse of discretion standard is the correct standard for analyzing excited utterances).

We also believe that our decision in *Chapin* does not avail Woods. In that case, a 69-year-old male patient in a rest home uttered the statement, "Raped me." *Chapin*, 118 Wn.2d at 683. The statement appeared to be directed at one of the patient's male attendants. The attendant was subsequently charged with and convicted of second degree rape. We determined that the trial court abused its discretion in admitting the statement at the male attendant's trial. In doing so, we noted first that "the alleged rape occurred 'within a day or so' of Hillison's [the alleged victim] statement." *Chapin*, 118 Wn.2d at 689. We went on to chronicle other pertinent facts that convinced us it was an abuse of discretion for the trial court to admit the testimony of the alleged victim. We noted that:

> Hillison [the alleged victim] was confused, prone to confabulation, subject to persecutory delusions, hostile to those who tried to direct his behavior, and hostile in particular to male attendants. Hillison made the statement, "Raped me", after calming down from being angry, not from being excited, and in response to a question from his wife. In addition, Hillison's anger was elicited not by any startling event, but by seeing Chapin, which was a normal part of Hillison's life at the Center and which had occurred at least twice previously that day. These factors leave us persuaded that Hillison's statement was not a spontaneous and reliable utterance made while he was under the stress of excitement caused by the occurrence of a startling event.

*Chapin*, 118 Wn.2d at 691.

In our judgment, *Chapin* is distinguishable from the present case and does not support Woods's argument that the trial court abused its discretion in admitting Jade's statements to Ragland-Stone. Although Jade did make some of her statements in response to questions from the paramedic, that does not necessarily mean that the response is inadmissible. *See State v. Ryan*, 103 Wn.2d 165, 176, 691 P.2d 197 (1984). The key is spontaneity. *State v.*

*Palomo*, 113 Wn.2d 789, 791, 783 P.2d 575 (1989). Here, the record reflects that the statements to Ragland-Stone were made, in a spontaneous manner, on the heels of a clearly startling event. It is significant that only about 45 minutes had elapsed between the time when Woods fled the crime scene and Jade made the statements to Ragland-Stone. This is by no means a prolonged time frame between the event and the time of the statement. *See State v. Flett*, 40 Wn. App. 277, 287, 699 P.2d 774 (1985) (statement made seven hours after rape deemed properly admitted upon finding of "continuing stress" between time of rape and statement). Thus, the lack of a temporal nexus between the startling event and the statement that concerned us in *Chapin* is not an issue here. Also, it is clear that when Jade was making the statements to Ragland-Stone, Jade was under the stress caused by the underlying assault. According to Ragland-Stone, when Jade was first moved into the ambulance, Ragland-Stone said she was "whimpering, like crying almost" and was "very emotional, very distraught, clearly upset and in a lot of pain." VRP at 2899. Ragland-Stone also indicated that Jade was "very upset." VRP at 2903. Moreover, the record indicates that, unlike the alleged victim in *Chapin*, Jade was not delusional or confused. According to Ragland-Stone, Jade knew "the month and the year and the city" and also corrected Ragland-Stone when she called Jade "Maid." VRP at 2908.

We also do not believe that our decision in *State v. Brown* required the trial court to exclude the testimony of Jade's father. In *Brown*, the defendant was found guilty of second degree rape. At trial, the trial judge admitted a tape of the alleged victim's 911 call as an excited utterance. The testimony from the alleged victim in that case showed that she was initially reluctant to call the police because "she did not think the police would believe she was raped because she went to the apartment willingly and the police knew she was a prostitute." *Brown*, 127 Wn.2d at 753. To put a more favorable spin on her story, the alleged victim in that case decided she would "tell the police that she had been

abducted" and then "went to the assistant manager's apartment to use the phone and called 911 to report the rape." *Id.* We held that the statements made during the 911 call did not fall within the purview of the excited utterance exception, noting that the exception is based on the idea that " 'under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control.' " *Id.* at 758 (quoting *Chapin*, 118 Wn.2d at 686). Because it was apparent that the alleged victim had fabricated a portion of her story, we concluded that the victim's reflective faculties were not stilled; rather, they were fully functional.

■ Woods, attempting to draw analogies to *Brown*, points out that Jade "did not tell her father she had been out drinking; she did not tell him she wanted to buy drugs from Venus's friend; she claimed she had 'gone to bed early,' when in fact she was still up and ready to 'party' at 3:30-3:45 a.m." Br. of Appellant at 105. Woods argues that Jade's omissions "demonstrate she had time to reflect and to consider her own self-interest." Br. of Appellant at 106. In essence, Woods is asking us to hold that Jade's omissions are equivalent to the fabricated story told by the alleged victim in *Brown*. This we are unwilling to do. Unlike the situation in *Brown*, there is no evidence here that Jade had spun a story so that she would sound more credible to the authorities. Even if we assume that Jade consciously omitted certain information from her statements to her father, we do not believe her act of omission is at all comparable to the deception we observed in *Brown*. The alleged victim in *Brown* affirmatively hatched a story to bolster her own credibility. Jade, on the other hand, merely failed to relate information about certain events in the evening. The fact that Jade failed to provide details about the previous night during her brief encounter with her father, especially after being brutalized in such an egregious manner, is not comparable to the fabrication of fanciful statements that we saw in *Brown*.

In short, we are satisfied that it was not manifestly

unreasonable for the trial court to admit Jade's statements to Ragland-Stone and her father as excited utterances.

### b. Medical Diagnosis Testimony

Before Jade died she also made several statements to the emergency room physician and the emergency room nurse. Pursuant to ER 803(a)(4), the medical diagnosis exception to the rule against hearsay, the trial court allowed the physician and nurse both to testify as to what Jade told them.

During an examination of Jade by the emergency room physician, Dr. Edminster, Jade told him that she "was awakened by this person who apparently had gotten in bed with her and . . . had indicated to her that he wanted to have sex with her." VRP at 2846. Dr. Edminster testified that Jade also mentioned that Woods had "hauled her out of bed, took her into the room where Venus was, showed Venus to her and said, . . . 'if you don't do what I tell you, you are going to end up in the same condition.' " VRP at 2846. Jade also told Dr. Edminster that when Telisha entered the trailer she was ordered to "stand up against the window and look out." VRP at 2849. He said that Jade told him that Telisha "was bound and that she [Jade] didn't actually see it happen, but she heard, you know, a thump like something getting hit hard." VRP at 2847. Finally, Jade told Dr. Edminster that she "did not actually see what happened" but she said she "heard the bat swing and heard it hit Telisha's head." VRP at 2849.

When the emergency room nurse, Diane Bethel, conducted a rape examination on Jade later that day, Jade told Bethel that "she was awakened by someone that came into her room" and that he "wanted to have sex with her." VRP at 2890. Jade went on to tell Bethel that "he took her to another room and showed her a friend that had been assaulted." VRP at 2890. Jade also told Bethel that "she was hit with a baseball bat" and that the "assailant had two knives." VRP at 2890-91.

■ An out-of-court statement offered to prove the truth of the matter asserted is admissible at trial if it is a statement "made for purposes of medical diagnosis or treatment." ER 803(a)(4). When a trial court admits testimony pursuant to this exception, we review that decision under an abuse of discretion standard. *See State v. Swan*, 114 Wn.2d 613, 667, 790 P.2d 610 (1990). The medical treatment exception applies to statements reasonably pertinent to diagnosis or treatment. *In re Dependency of Penelope B.*, 104 Wn.2d 643, 656, 709 P.2d 1185 (1985). " 'Thus, statements as to causation ("I was hit by a car") would normally be allowed, but statements as to fault (" . . . which ran a red light") would not.' " *Id.* (quoting 5A Karl B. Tegland, Washington Practice § 367, at 224 (2d ed. 1982)).

■ Woods contends that none of these statements by Jade were "reasonably pertinent to diagnosis or treatment." Br. of Appellant at 107. We disagree, concluding that Woods incorrectly confines the definition of "medical treatment" to a limited medical lexicon involving only physical injuries. The medical treatment exception, however, is not so limited. *See, e.g., State v. Florczak*, 76 Wn. App. 55, 65, 882 P.2d 199 (1994) (observing that psychological treatment falls within definition of medical treatment exception).

It is clear from the record that the challenged statements were pertinent to either the physical or psychological treatment of Jade or Telisha. With respect to Jade's treatment, the emergency room physician testified that he needed to have an idea of what happened "the same way the patient knows the story" for the purpose of "arranging for like counseling after the fact because people are going to have a certain amount of post traumatic distress." VRP at 2844. It appears to us that it was "reasonably pertinent" to an assessment of Jade's need for counseling that during the attack she was subjected to viewing the beaten body of her friend Venus. Also, if Jade believed she heard Telisha get hit by a bat, we believe such an event would be relevant to addressing Jade's needs. Additionally, we believe, as did the

trial court, that it appears reasonably pertinent to Telisha's treatment that her medical providers be apprised of the physical position she was in at the time when her attack occurred. As such, it was not erroneous for the trial court to admit Jade's statement regarding Telisha's attack. *Cf. State v. Justiniano*, 48 Wn. App. 572, 581, 740 P.2d 872 (1987) (noting that "the statements made to the doctor by the mother are the equivalent of statements made by the child to the doctor and are admissible under ER 803(a)(4)").

In sum, all of the statements made by Jade to Dr. Edminster and Bethel were reasonably pertinent to either immediate physical or eventual psychological treatment of Jade, Telisha, or both. The trial court did not, therefore, abuse its discretion in admitting these statements pursuant to the "medical diagnosis" exception to the rule against the admission of hearsay.

## C. Penalty Phase Errors

### 1. Denial of Continuance

Woods argues that the trial court abused its discretion in denying his defense counsel's motion for a one-week continuance between the guilt and penalty phases. Woods now asserts that this continuance was necessary in order for his counsel to have his competency assessed. He claims that because of this error, his death sentence should be vacated and a new sentencing proceeding should be conducted. The State responds that the trial court committed no error in denying the defense motion because the defense failed to establish a "threshold showing of incompetency." Br. of Resp't at 82.

"Because the death penalty qualitatively differs from all other punishments, there must be reliability in the determination that death is the appropriate punishment." *State v. Lord*, 117 Wn.2d 829, 888, 822 P.2d 177 (1991) (citing *Johnson v. Mississippi*, 486 U.S. 578, 584, 108 S. Ct. 1981, 100 L. Ed. 2d 575 (1988)). As a result of this

qualitative difference, "capital sentencing determinations are subjected to a correspondingly higher degree of scrutiny than sentencing in noncapital cases." *Lord*, 117 Wn.2d at 888. Heightened scrutiny does not, however, alter the standard of our review. Rather, heightened scrutiny means that we will engage in "a closer, more careful review of the record." *Id*. The grant or denial of a motion to continue is within the discretion of the trial court and is reviewable on appeal only for manifest abuse of discretion. *State v. Adamski*, 111 Wn.2d 574, 577, 761 P.2d 621 (1988). Thus, the standard of review on this particular issue requires us to "more carefully review the factual basis upon which the trial court relied" to ensure that its denial of the one-week continuance was not manifestly unreasonable. *Lord*, 117 Wn.2d at 888.

In determining whether the trial court abused its discretion in denying the one-week continuance in order to have Woods's mental health assessed, we first have to ask whether Woods's counsel was entitled to have Woods examined. The answer to this inquiry is found in RCW 10.77.060(1)(a), the statute outlining what a trial court must do when there is reason to doubt the acuity of the defendant's mental health. The relevant portion of that statute is as follows:

> Whenever a defendant has pleaded not guilty by reason of insanity, or there is reason to doubt his or her competency, the court on its own motion or on the motion of any party shall either appoint or request the secretary to designate at least two qualified experts or professional persons, one of whom shall be approved by the prosecuting attorney, to examine and report upon the mental condition of the defendant.

RCW 10.77.060(1)(a).

A defendant is "incompetent" if he or she "lacks the capacity to understand the nature of the proceedings against him or her or to assist in his or her own defense as a result of mental disease or defect." RCW 10.77.010(14). As we noted in *Lord*, the defense bears the "threshold burden" of establishing that there is reason to doubt the defendant's

competency. *Lord*, 117 Wn.2d at 903. We further observed in that case that although "considerable weight" should be given to the attorney's opinion regarding the client's competency, that opinion is not necessarily dispositive. *Id.* at 901. Instead, the ultimate question for the trial court is whether there is a "factual basis" to doubt the defendant's competence. The question before us, then, is whether the record reflects that there was a "factual basis" for the trial court to doubt the competency of Woods. If there was such a basis, the trial court should have granted the continuance. If not, there was no error in denying the motion for continuance.

▇▇ ▇▇ Woods argues here, as did his counsel at the trial court, that there were several indications of Woods's faltering competency at the time the penalty phase commenced. Woods asserts that his statement to the media, to the effect that he would not challenge the death penalty, was indicative of his incompetence. Woods also alleges that his desire to forgo the presentation of mitigation evidence was an earmark of incompetence. Woods also points out that there were two declarations filed by "experts in the area of capital trials" and these declarations indicated that he was incompetent at the outset of the penalty phase. Finally, Woods points out that on the day the penalty phase began, he mistakenly told the trial court that he had not met on a previous occasion with two mental health professionals.

We do not believe that Woods's counsel established a factual basis of Woods's incompetence. The fact that Woods told the media that he would not challenge the death penalty and that he decided, against the advice of counsel, to forgo the presentation of mitigation evidence, does not, in our judgment, establish a threshold showing of incompetence. As we recently noted in *State v. Sagastegui*, 135 Wn.2d 67, 954 P.2d 1311 (1998), a defendant may have several legitimate reasons for forgoing the presentation of mitigating evidence, thus increasing the likelihood of a death sentence being imposed. For example, we noted in

that case that the defendant might have thought, "death is a just punishment for the crimes he committed." *Sagastegui*, 135 Wn.2d at 88-89. We also observed there that it might have been the defendant's belief that "living in a cell for the rest of his life would be worse punishment than the death penalty." *Id*. at 89. The reasons for forgoing the presentation of mitigation evidence that we discussed in *Sagastegui* apply with equal force in this case. In short, we believe that just because a defendant may wish to forgo the presentation of mitigation testimony and thus potentially increase the likelihood of a death sentence, that does not mean the defendant is mentally infirm.

We also are satisfied that the declarations filed by the two "death penalty experts" did not add any weight to the defense effort to establish a "threshold showing" of Woods's incompetency. We say that because the record indicates that neither of these two individuals personally examined Woods; rather, their assessments of Woods were based on conversations they had with Woods's counsel. Moreover, even putting their lack of personal contact with Woods aside, the substance of these declarations, even if true, does not lead to the conclusion that Woods was unable to assist in his own defense and was, thus, incompetent. One of the declarations was by Scharlette Holdman, an individual who claimed she had "extensive direct personal experience with people charged with capital murder." CP at 2680. She opined that Woods was probably experiencing an "emotional disturbance" and "acute depression" because of the unfavorable guilty verdict. CP at 2681. The other declaration was submitted by Kathryn Ross, an attorney with experience in the realm of "capital defense" cases. CP at 2711. Her declaration indicated that Woods was "despondent" and in a "highly emotional state." CP at 2711. Although these declarations may lend weight to the not surprising view that Woods was upset by the guilty verdict, there is nothing in these submissions that suggests that Woods was mentally incompetent.

The only information imparted to the trial court

that remotely suggests that Woods had become incompetent after the jury had reached its verdict in the guilt phase of the trial was Woods's inability to recall that he had met with the two mental health professional who had examined him before trial. We do not believe that Woods's inability to recall what mental health professional he met with, without more, establishes a "threshold showing" of an incompetent mental state. In fact, other than that one occurrence, the record indicates that Woods was in a fit mental state. He had been examined prior to trial, and the examination indicated that Woods was "a man of at least average intellectual endowment." Report of Trial Judge at 2. His performance on conceptual and executive functions were judged to be superior, "suggesting at least average or high average native endowment." Report of Trial Judge at 2. The psychiatric evaluation further indicated that Woods was: "(i) able to distinguish right from wrong," "(ii) able to perceive the nature and quality of his or her act," and "(iii) able to cooperate intelligently in his or her own defense." Report of Trial Judge at 3.

We also take particular note of the fact that prior to the commencement of the penalty phase, the trial court engaged in a conversation with Woods, albeit brief, about his mental state. The exchange is as follows:

THE COURT: I need to know, Mr. Sheehan has alleged that you are ill. Are you?

MR. WOODS: No.

THE COURT: Are you thinking clearly?

MR. WOODS: Yes.

THE COURT: Are you depressed?

MR. WOODS: No, sir.

THE COURT: Do you know what I mean by that?

MR. WOODS: Yes, I do.

VRP at 5736. Although the questioning was not lengthy, we believe that given the dearth of other indicia of incompetence, this exchange with Woods was sufficient to satisfy a

reasonable person that Woods was, at that time, free of mental defect. Like the trial judge, we do not easily jump to a conclusion that an upsetting event at trial suddenly transforms a competent person into a state of incompetence.

In sum, after a heightened review of the record, we believe that the defense failed to make a "threshold showing" that Woods was unable to understand the proceedings against him or assist his counsel at the time the penalty phase of the trial commenced. Although Woods may have been despondent and upset, we do not believe that possessing those emotions is the functional equivalent of mental incompetence. Because the defense failed to make the required showing, the trial court did not abuse its discretion in denying the motion for a one-week continuance.[12]

### 2. Woods's Waiver of Right to Present Mitigation Evidence

Woods also claims that the trial court erred in failing to conduct a "colloquy" to ensure that Woods's decision to waive his right to present mitigating evidence at the penalty phase was the product of an "intelligent, knowing and voluntary" choice. Br. of Appellant at 130. Because of the trial court's failure to engage in this colloquy, Woods asserts, he is entitled to have his sentence of death vacated and the case remanded to the trial court for a new sentencing proceeding.

A capital defendant has a statutory and constitutional right to present relevant evidence in mitigation for the purposes of sentencing. *Eddings v. Oklahoma*, 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982); *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978). The defendant is not, however, under any legal obligation to

---

[12] Woods also asserts that the trial court's error in denying the continuance leaves "an unreliable record that prevents the statutory review required by 10.95.130." Br. of Appellant at 138. Because we determine there was no error in denying the motion for the continuance, we conclude that there is a reliable record for us to conduct our statutory review pursuant to RCW 10.95.130.

present such evidence. *Sagastegui*, 135 Wn.2d at 88. Like other constitutional rights, a defendant may waive the right to present mitigating evidence so long as the waiver is made "knowingly, voluntarily, and intelligently."

We first observe that, heretofore, we have not been faced with the question we have here—what the trial court must do to ensure that a defendant's waiver of the right to present mitigating evidence is made in a knowing, voluntary, and intelligent fashion. We also note that neither the United States Supreme Court nor the Ninth Circuit Court of Appeals has addressed this precise issue. Faced with the question now, we conclude that a trial court need not conduct a "colloquy" to ensure that a capital defendant's decision to waive the right to present mitigating evidence is a voluntary, intelligent, and knowing choice. Rather, like the evaluation of a defendant's waiver of the right to testify on his or her own behalf, "the judge may assume a knowing waiver of the right from the defendant's conduct." *State v. Thomas*, 128 Wn.2d 553, 559, 910 P.2d 475 (1996). In our view, the decision of whether or not to present mitigating evidence, like other decisions that must be made in the course of a trial, is one that is influenced by trial strategy. Thus, the responsibility for informing the defendant of this right and discussing the merits and demerits of the decision resides with defense counsel. Under this standard, it is clear that Woods made a voluntary, intelligent, and knowing choice not to present mitigating evidence.[13]

Even if we were to assume that the trial court must engage in a colloquy with the defendant in order to spread on the record that the waiver is constitutionally valid, we believe that Woods's decision not to present mitigating

---

[13] The dissenting opinion suggests that a colloquy should be required because the "presentation of such mitigating evidence is necessary for our subsequent proportionality review which includes consideration of . . . mitigating circumstances." Dissent at 630. Even assuming that we are required to consider mitigating evidence during a proportionality review, we would only consider such evidence if it were actually presented. *See State v. Dodd*, 120 Wn.2d 1, 29, 838 P.2d 86 (1992) (Andersen, J., concurring) ("once a competent defendant has knowingly made the decision to waive his or her right to introduce mitigating circumstances, an appellate court may *not* hear and weigh mitigating circumstances").

evidence in this case would still pass constitutional muster. We note in that regard that courts in several other states have adopted specific procedures that must be followed by a trial court when a defendant desires to forgo the presentation of mitigating evidence. *See, e.g., Fitzgerald v. State,* 1998 OK CR 68, 972 P.2d 1157; *State v. Ashworth,* 85 Ohio St. 3d 56, 706 N.E.2d 1231 (1999); *Chandler v. State,* 702 So. 2d 186, 192 (Fla. 1997). Although the exact procedures that these courts apply in determining if a waiver of the right to present mitigating evidence is valid differ slightly, there are two requirements that are common to all. In each, the trial court must: (1) apprise the defendant of what mitigation evidence is and its role in the capital sentencing process, and (2) inquire whether the defendant desires to waive the right to present such evidence.

Pertinent to these requirements, the following exchange occurred between Woods and the trial court shortly before the penalty phase began:

> THE COURT: . . . Do you understand that in the death penalty sentencing phase, this next phase we're talking about, you have a right to make an unsworn statement to the jury, that is your right of allocution?
>
> MR. WOODS: Yes.
>
> THE COURT: You also understand that in this phase of the trial you have the right to present mitigation testimony?
>
> MR. WOODS: Yes.
>
> THE COURT: Testimony to persuade the jury that the right choice is leniency, from your perspective?
>
> MR. WOODS: Yes.

VRP at 5737. This exchange between the trial court and Woods satisfies the first requirement of the tests established in these other states. We say that because it is clear that Woods was informed of what mitigation evidence is and what its role is in the capital sentencing process.[14]

---

[14] In an effort to challenge the sufficiency of the trial court's inquiry, the dissent argues that *Battenfield v. Gibson,* 236 F.3d 1215 (10th Cir. 2001) is instructive. The facts of that case are, however, distinguishable. In *Battenfield,* the trial court

Insofar as the second requirement is concerned, its fulfillment can be gleaned from several exchanges that occurred between the trial court and Woods and his attorney. When the trial court was hearing arguments on whether to grant defense counsel's motion for a continuance, Woods's attorney informed the court that "it's Dwayne's wishes, at least as far as expressed most recently to me, that we not put on any mitigation at all." VRP at 5737. Also, in response to the trial court's inquiry on that matter, Woods responded: "I would ask that this motion [to continue] be denied and let me proceed with as scheduled." VRP at 5736. Finally, we have Woods's statement to the jury that there was no mitigating evidence and that he desired that they vote to impose the death penalty against him, which unequivocally evidences his intent to waive his right to present mitigating evidence. *See* VRP at 5774. Our examination of these statements leads us to conclude that the two common requirements of the tests adopted in other states were satisfied in this case. Although these exchanges were brief, they were sufficient to provide assurance that Woods's decision not to present mitigating evidence was made after he was apprised of the nature of mitigation evidence and the potential benefit to him of producing such evidence at this stage in the proceedings. Thus, while we do not believe that these procedures are constitutionally necessary, we are of the view that they would have been satisfied in this case.

### 3. Additional Issues Raised by Woods

Before we address the mandatory review issues set forth in RCW 10.95.130, we find it necessary to briefly discuss two arguments advanced by Woods relating to the unconstitutionality of RCW 10.95.130 and the updating of the trial judge reports in capital cases.

---

merely asked the defendant, without providing a definition, whether he knew the meaning of mitigating evidence. *Id.* at 1231-32. Here, on the other hand, the trial court explained to Woods that mitigating evidence is "[t]estimony to persuade the jury that the right choice is leniency, from [Woods's] perspective." VRP at 5737.

### a. Due Process Challenge to Proportionality Review

 Woods first argues that the statutorily mandated proportionality review of RCW 10.95.130 violates due process. In support of this contention, he relies on *Harris ex rel. Ramseyer v. Blodgett*, 853 F. Supp. 1239 (W.D. Wash. 1994), *aff'd on other grounds*, 64 F.3d 1432 (9th Cir. 1995). In that case a federal district court judge held that this court's application of the statutorily required proportionality review procedure embodied in RCW 10.95.130(2)(b) violated due process. *Blodgett*, 853 F. Supp. at 1292. We reject Woods's argument that the proportionality review contained in RCW 10.95.130 is unconstitutional. We do so because this argument is nothing more than a reprise of the exact argument that was advanced and recently rejected by us in *In re Personal Restraint of Benn*, 134 Wn.2d 868, 952 P.2d 116 (1998), *habeas corpus granted on other grounds by Benn v. Wood*, 2000 U.S. Dist. LEXIS 12741, 2000 WL 1031361 (W.D. Wash. June 30, 2000) (No. C98-5131FDB). In *Benn*, as here, the defendant relied on *Harris* to support a due process challenge to the proportionality review contained in RCW 10.95.130(2)(b). We explicitly rejected the lone federal district court judge's decision in *Harris*, noting that "[t]he existence of an analytically flawed federal district court decision is not a compelling reason to vacate this defendant's death sentence or reconsider the proportionality review in his case." *Benn*, 134 Wn.2d at 928. We are not inclined to overrule our recent decision in *Benn*.

### b. Updating Trial Judge Reports

 Woods asserts that RCW 10.95.120 requires "trial judges to file updated reports after entry of a new judgment and sentence in a case that once was a capital case[.]" Br. of Appellant at 163. In other words, Woods asserts that when a trial court imposes the death penalty but that penalty is overturned, or the case is remanded for resentencing by an appellate court, the report of the trial judge should be updated to reflect the change in the sentencing status of

that defendant. He claims that since these trial judge reports form the "core of this Court's proportionality review," failure to update the reports undermines credibility of the proportionally review. Br. of Appellant at 161.

We do not believe that RCW 10.95.120 requires trial judge reports to be updated to reflect the current sentencing status in capital cases. The pertinent statute says:

> In all cases in which a person is convicted of aggravated first degree murder, the trial court shall, within thirty days after the entry of the judgment and sentence, submit a report to the clerk of the supreme court of Washington, to the defendant or his or her attorney, and to the prosecuting attorney which provides the information specified under subsections (1) through (8) of this section.

RCW 10.95.120. All that is required is that the trial judge submit the completed report to the clerk of this court. RCW 10.95.120. Although a death sentence in a particular case may be overturned by a reviewing court, that does not invalidate that trial judge's report for purposes of our proportionately review. Quite the contrary, in assessing whether a death sentence is proportionate we examine cases "in which the judge or jury *considered the imposition of capital punishment regardless of whether it was imposed or executed*[.]" RCW 10.95.130(2)(b) (emphasis added); *see also State v. Elmore*, 139 Wn.2d 250, 309 n.26, 985 P.2d 289 (1999), *cert. denied*, 531 U.S. 837 (2000). As this statutory language indicates, the relevant universe of "similar cases" is not limited to those where the death sentence was upheld on appeal or eventually carried out. Rather, the relevant universe is much more broadly defined as those cases where the trier of fact (be it judge or jury) merely *considered* death as a possible alternative to life without the possibility of parole.

Because RCW 10.95.130 does not limit the scope of "similar cases" to those where the death penalty has actually been upheld on review or eventually implemented, we do not believe there is a requirement for trial courts to

amend their reports to reflect the current sentencing status of a defendant convicted of aggravated first degree murder.

## D. Statutory Review Issues

As required by RCW 10.95.130, this court is required to review the sentence of death and determine: (1) whether there was sufficient evidence to justify the affirmative finding by the jury that there were not sufficient mitigating circumstances to merit leniency; (2) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; (3) whether the sentence of death was brought about by passion or prejudice.[15]

### 1. Sufficiency of the Evidence

Under RCW 10.95.130(2)(a) this court must determine whether there was sufficient evidence to justify the affirmative finding that there were not sufficient mitigating circumstances to merit leniency. In making this determination we ask whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found sufficient evidence to justify that conclusion beyond a reasonable doubt. *State v. Stenson*, 132 Wn.2d 668, 757, 940 P.2d 1239 (1997); *State v. Brown*, 132 Wn.2d 529, 551, 940 P.2d 546 (1997); *State v. Gentry*, 125 Wn.2d 570, 654, 888 P.2d 1105, *cert. denied*, 516 U.S. 843 (1995). We do not, however, duplicate the jury's role and engage in reweighing the aggravating circumstances against the mitigating factors. Rather, we consider the circumstances of the crime along with any mitigating factors and determine whether a rational jury could have concluded the mitigating circumstances do not outweigh the circumstances of the crime. *State v. Dodd*, 120 Wn.2d 1, 24-25, 838 P.2d 86 (1992).

---

[15] Under RCW 10.95.130(2)(d), we are also required to determine whether the defendant was mentally retarded. There was no argument or evidence presented in this case that even suggested that Woods suffers or suffered from mental retardation. Therefore, we do not discuss this issue.

We are satisfied that there is sufficient evidence to support the jury conclusion that leniency was not merited. The record shows that the State presented strong evidence that convinced a jury that Woods was guilty of these crimes that were extremely ghastly and violently executed. The jury found that, with premeditation, Woods severely bludgeoned three young women. Two of them were unable to escape death because of massive and multiple blows to their heads with a blunt object—a bat. Woods also raped one of the young women and that woman eventually died. In the face of this showing, Woods presented no mitigating evidence. On the contrary, during the penalty phase Woods essentially implored the jury to impose the death penalty because there were absolutely no mitigating circumstances, "not one." VRP at 5774. Given the callous nature of the crimes of which Woods was convicted, and the absence of mitigating evidence, it can easily be said that there is sufficient evidence in the record to support the jury's finding that there are not sufficient mitigating circumstances to merit leniency. The requirements of RCW 10.95.130(2)(a) are, therefore, met.

## 2. Proportionality

We are also required to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." RCW 10.95.130(2)(b). The purpose of conducting this proportionality review is to ensure that the death sentence is not imposed in a "wanton or freakish" manner. *State v. Pirtle*, 127 Wn.2d 628, 688, 904 P.2d 245 (1995); *State v. Brett*, 126 Wn.2d 136, 211, 892 P.2d 29 (1995). In conducting proportionality review, we are principally concerned with avoiding two systemic problems associated with imposition of capital punishment: random arbitrariness and imposition of the death sentence in a racially discriminatory manner. *Gentry*, 125 Wn.2d at 655.

In conducting this review we compare this case to "similar cases" as defined by RCW 10.95.130(2)(b). That statute defines similar cases as those cases "reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120."

In assessing whether the death penalty in this case is proportionate to other cases in which the death penalty is imposed, we use a four-part test which includes (1) the nature of the crime, (2) the aggravating circumstances, (3) the defendant's criminal history and (4) the defendant's personal history. *Brown*, 132 Wn.2d at 555-56. We discuss each of these in turn.

### a. Nature of the Crime

The crime scene and the injuries sustained by the victims in this case illustrate the exceptional brutality of the crimes Woods committed. A 21-year veteran of the Spokane Valley fire paramedics division testified "[t]hat someone had perpetrated some of the worst violence I have ever seen." VRP at 3094, 3098. In the bedroom where the victims were found the fire station captain testified that "[i]t was something I had never seen before." VRP at 3127. He said that blood was "everywhere" and that it looked like someone "had taken a paint brush and just splattered it all over the place." VRP at 3130.

A case with earmarks of similar brutality to the present case is *State v. Stenson*. There, the murderer killed two young adults. One of the victims was the mother of three young children. Both victims suffered conscious pain and fear before they died. Although barely able to speak after she was brutalized, the mother implored the paramedics to help her. The autopsy of the other victim showed that he was beat in the face and head, that he struggled to escape, and that he was dragged into the house and shot in the

head. *Stenson*, 132 Wn.2d at 759.

This case similarly involves the murder of two young adults who both consciously suffered before succumbing to death. One of the murder victims, Jade Moore, was forced to see her bloody and battered friend, Venus. Jade was also forced to perform oral sex, forced to have vaginal sex, and was commanded to slit the throat of her friend. When Jade refused the possibility of saving her own life by cutting her friend's throat, she was beaten by Woods into an unconscious state with a bat. Her suffering, however, did not end there. She regained consciousness and was responsive to medical treatment. Unfortunately, her recovery did not last, and the swelling of her brain eventually caused her to expire. The other murder victim, Telisha Shaver, was forced, upon entering the trailer home, to turn around and face out the window. This was a particularly vulnerable and angst-filled placement for Telisha given the fact that she would be uncertain of when or if she would be released by her assailant and what he might do to her in the process. Unfortunately, she never was set free. Instead her hands were bound and she received several crushing blows to the head which caused her death.

## b. Aggravating Circumstances

There are three aggravating circumstances in this case. The murders were committed to conceal the identity of the killer, there were multiple murders that were part of a common scheme or plan, and the murders were committed in immediate flight from the crime of rape. Currently, out of the 186 trial judge reports, 149 (approximately 79 percent) of those involved crimes with one or two aggravating circumstances. The remaining 37 (approximately 21 percent) had three or more aggravating circumstances. Thus, the defendant's crime falls within the top 21 percent of crimes with the highest number of aggravating circumstances.

### c. Criminal History

The defendant's criminal history illustrates that he has been violent to others in the past. Prior to the event described above, he had been convicted of second degree assault twice. One conviction was in 1991 and the other in 1993. The criminal history in this case is comparably more egregious than other capital defendants who received the death penalty. *See State v. Rupe*, 108 Wn.2d 734, 770, 743 P.2d 210 (1987) ("no prior criminal record"). Even in some cases where the defendants had a criminal history, those histories were arguably less substantial than Woods's because his illustrates a pattern of violence toward others. *See, e.g., State v. Stenson*, 132 Wn.2d at 760 ("[t]he Defendant did have some criminal history, including felony drug convictions, although none of the prior crimes were crimes of violence").

### d. Personal History

There were no mitigating factors presented during the penalty phase of the trial. Indeed, as noted above, Woods told the jury that there were no mitigating factors for the jury to consider. In this respect, this case is similar to the *Sagastegui* case where the defendant also refused to present mitigating evidence and essentially told the jury that mitigating factors did not exist.

In sum, after viewing all of the pertinent criteria, we believe that there is no unique or distinguishing characteristic of the defendant or of this crime which makes imposition of the death penalty "wanton or freakish." After comparing Woods's case to the cases mentioned above in which the death sentences were found to be proportional, as well as to those cases which have since been added to the pool of potentially similar cases, the sentence of death imposed here is neither excessive nor disproportionate.

### 3. Passion or Prejudice

Finally, Woods argues that the death penalty was imposed as a result of passion or prejudice. As support for this argument he asserts that in Spokane County, "the state has sought death in every aggravated murder case in which the defendant was black, but only in 20% of the cases in which the defendant was white."[16] Br. of Appellant at 186. He also argues that prejudice infiltrated the sentencing proceeding because all potential jurors were white and "statistics and anecdotal evidence of events at the time of this charge and trial reflect significant racism in the Spokane area." Br. of Appellant at 187. Finally, he asserts that historically the death penalty has been disproportionately imposed on African Americans. Br. of Appellant at 187 (citing *Furman v. Georgia*, 408 U.S. 238, 364, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) (Marshall J., concurring)). Woods argues that when all of this is combined, "there can be no question but that prejudice entered into the penalty decision in this case." Br. of Appellant at 188.

To prevail with this argument under the Equal Protection Clause, Woods must establish that the decision makers in his case acted with discriminatory purpose. *See McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987). "Because discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused." *Id.* at 297. In *McCleskey*, the defendant argued that the death penalty was unconstitutionally imposed on black persons. In support of his argument the defendant proffered a study that contained significant detail and was well researched. The study was based on over 2,000 murder cases that occurred in Georgia during the 1970s and included data relating to the race of the victim and the defendant's race. The study indicated that black defendants who killed white victims had the greatest likelihood of

---

[16] Woods is an African American.

receiving the death penalty.[17] *Id.* at 286.

The Supreme Court concluded that the study did establish that racial considerations played a part in the imposition of the death penalty. It noted that, at most, the study indicates a discrepancy that appears to correlate with race, but does not constitute a major "systemic defect." *Id.* at 313.

If the study in the *McCleskey* case was insufficient to indicate that race played a factor in the imposition of the death penalty, the relatively few cases from Spokane County fare no better. In short, we believe we have been presented with insufficient data to permit us to draw any conclusion that race played a factor in the prosecutor's decision to seek the death penalty here. From 1984 through 1996, 13 people have been sentenced on the charge of aggravated first degree murder in Spokane County. Of those 13 people, 10 were white (77 percent), 2 were black (15 percent), and 1 was a Native American (8 percent). The prosecutor sought the death penalty in 5 out of the 10 cases involving white defendants (50 percent). The prosecutor sought the death penalty in both cases where the defendant was black and in the one case where the defendant was

---

[17] The raw numbers collected in the study indicated that defendants charged with killing white persons received the death penalty in 11 percent of the cases, but defendants charged with killing blacks received the death penalty in only 1 percent of the cases. The raw numbers also indicated a reverse racial disparity according to the race of the defendant: 4 percent of the black defendants received the death penalty, as opposed to 7 percent of the white defendants. The study also divided the cases according to the combination of the race of the defendant and the race of the victim. It found that the death penalty was assessed in 22 percent of the cases involving black defendants and white victims; 8 percent of the cases involving white defendants and white victims; 1 percent of the cases involving black defendants and black victims; and 3 percent of the cases involving white defendants and black victims. Similarly, the study found that prosecutors sought the death penalty in 70 percent of the cases involving black defendants and white victims; 32 percent of the cases involving white defendants and white victims; 15 percent of the cases involving black defendants and black victims; and 19 percent of the cases involving white defendants and black victims. This data was subjected to an extensive analysis, taking account of 230 variables that could have explained the disparities on nonracial grounds. One of his models concludes that, even after taking account of 39 nonracial variables, defendants charged with killing white victims were 4.3 times as likely to receive a death sentence as defendants charged with killing blacks. According to this model, black defendants were 1.1 times as likely to receive a death sentence as other defendants. *McCleskey*, 481 U.S. at 286-87.

Native American. Woods asserts these numbers show that the prosecutor looks to race in deciding whether to seek the death penalty. Such a conclusion cannot be inferred from this limited number of cases.

Similarly, "statistics and anecdotal evidence" of racism in Spokane are also not sufficient to support an inference that race played a part in the jury's imposition of the death penalty. Again, there must be "exceptionally clear proof" of such discrimination and the mere fact that racism has occurred in a community does not make the grade. Indeed, if anything, there is an inference that the jury in this case did not impose the death sentence as a result of prejudice. The trial judge report in this case indicates that the jury deliberated for two days before reaching its decision to impose the death sentence. If the jury was motivated by racial prejudice, it seems probable, particularly in light of the absence of mitigating evidence, that it would have moved with more deliberate speed in imposing the death sentence.

## VI. CONCLUSION

We are satisfied that Woods was afforded a fair trial and that the trial court did not commit any errors that require us to disturb its findings of guilt or the imposition of the death penalty. There was, significantly, sufficient evidence to justify the jury's finding that leniency was not merited. We also believe that the imposition of the death penalty in this case is not disproportionate or excessive when viewed against the penalty imposed in similar cases. Finally, we are satisfied that the imposition of the death penalty was not a product of passion or prejudice. We conclude, therefore, that his convictions for aggravated first degree murder and attempted first degree murder should be affirmed, as is the sentence of death.

In accordance with RCW 10.95.140, this case is remanded to the Spokane County Superior Court.

SMITH, JOHNSON, MADSEN, IRELAND, and BRIDGE, JJ., and GUY, J. Pro Tem., concur.

SANDERS, J. (dissenting) — The defendant is not subject to the death penalty because the state did not timely serve the statutorily required notice within 30 days of arraignment; defense attorneys were wrongfully denied a continuance to assess whether Dwayne Woods was entitled to a statutorily mandated competency hearing; and, finally, the court failed to adequately establish waiver of the right to present mitigation evidence.

## I

### Notice of Special Sentencing Proceeding

Given the unique qualities of the death penalty, the Legislature has tailored pretrial procedures to govern the use of a special sentencing proceeding. . . . [F]iling and service of notice is mandatory—no notice, no death penalty.[18]

Where the penalty is death, and the statutory requirement is plainly stated, the state must follow mandated statutory procedures.

RCW 10.95.040(2) requires:

[t]he notice of special sentencing proceeding *shall* be filed and served on the defendant or the defendant's attorney *within thirty days after the defendant's arraignment upon the charge of aggravated first degree murder.* . . .

(Emphasis added.) A prosecuting attorney may not seek the death penalty "[i]f a notice of special sentencing proceeding is not filed and served as provided in this section." RCW 10.95.040(3).

Although the prosecutor filed a timely notice of special sentencing proceeding after Woods's first arraignment, a

---

[18] *State v. Dearbone*, 125 Wn.2d 173, 177, 883 P.2d 303 (1994).

second amended information was later filed which took the place of the first. *Woods was then rearraigned,* pleading not guilty to the new information, but no notice of a special sentencing was then served and filed pursuant to the statute.

The state argues the amendments were a change in form rather than substance, and thus they required neither a new arraignment nor a new notice. I disagree.

First, it is well settled substantial amendment to an information requires that the accused be arraigned on the amended information. *State v. Hurd,* 5 Wn.2d 308, 312, 105 P.2d 59 (1940); *see also* CrR 2.1(d) (amendment of existing information allowed only "if substantial rights of the defendant are not prejudiced.").

RCW 10.95.020(10) identifies as an aggravating circumstance, "[t]here was more than one victim *and* the murders were part of a common scheme or plan or the result of a single act of the person." (Emphasis added.) The original information, however, did not allege "there was more than one victim" in either Count I or II; therefore the sole aggravating circumstance alleged in the original information was simply "the murder[] [was] part of a common scheme or plan." RCW 10.95.020(10). The prosecutor then amended the information to add "*as an additional aggravating circumstance* that there were multiple victims involved in this offense." Clerk's Papers (CP) at 64 (emphasis added). This added aggravating factor was a substantive change that necessitated the rearraignment because it provided an additional basis to find the defendant guilty of the crime.

Second, and even more fundamentally, the second arraignment, necessary or not, *was* an arraignment. Thus it required a notice under the plain language of the statute. The second arraignment superseded the first.[19] The statute

---

[19] *See, e.g., State v. Navone,* 180 Wash. 121, 123-24, 39 P.2d 384 (1934) ("The second information was filed in the same proceeding as the first, and manifestly superseded the same. If the state should attempt to bring appellant to trial upon the first information, an appropriate remedy would doubtless be available to

mandates notice after arraignment but none was filed after the rearraignment.

> "[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long." Because of this difference, we should strive to ensure that the procedures and safeguards enacted by the Legislature are properly followed by the State. The determination of whether a defendant will live or die must be made in a particularly careful and reliable manner and in accordance with the procedures established by the Legislature.

*State v. Luvene*, 127 Wn.2d 690, 719 n.8, 903 P.2d 960 (1995) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976)). *Luvene* overturned a death penalty because the prosecutor failed to timely file a notice of intent to seek the death penalty under RCW 10.95.040. But the majority fails to follow *Luvene*'s mandate.

The majority claims the purpose of the statute is merely to provide notice the death penalty may be imposed, citing *State v. Clark*, 129 Wn.2d 805, 920 P.2d 187 (1996). Majority at 589. But this claim begs what the statute actually *says*, as opposed to what the majority would prefer it to say.[20]

*Clark* considered whether proper service was effectuated under RCW 10.95.040. Confronted with "an issue of statutory interpretation," we rejected a liberal construction of the statute,[21] noting the legislature's specific language on service of notice. *Clark*, 129 Wn.2d at 811-12. We pointed

---

him."); *State v. Lindsey*, 187 Wash. 364, 369, 61 P.2d 293 (1936), *rev'd on other grounds*, 301 U.S. 397 (1937) (quoting *Navone*); *State v. Oestreich*, 83 Wn. App. 648, 651, 922 P.2d 1369 (1996) (general rule is that an amended information supersedes the original); *State v. Kinard*, 21 Wn. App. 587, 589-90, 585 P.2d 836 (1978) (it has been uniformly held that the filing of an amended information constitutes an abandonment of the first information).

[20] We must avoid the "erroneous and all-too-common assumption that the Constitution means what we think it ought to mean. It does not; it means what it says." *Apprendi v. New Jersey*, 530 U.S. 466, 499, 120 S. Ct. 2348, 2367, 147 L. Ed. 2d 435 (2000) (Scalia, J., concurring).

[21] We also rejected liberal construction of RCW 10.95.040 in *Dearbone*, 125 Wn.2d at 182.

out that the state could have easily avoided the problem, opining:

> The State should be aware in light of *Dearbone* and *Luvene* that anything less than a punctilious approach toward the filing and service of the statutory notice in a death penalty case is a risky practice. *Especially when the ultimate penalty is involved, this Court's duty is to ensure the defendant receives every statutory protection the Legislature has provided. We will not condone sloppy practice in service of the notice under RCW 10.95.040.*

*Clark*, 129 Wn.2d at 816 (emphasis added).

The majority also cites *State v. Rupe*, 108 Wn.2d 734, 740, 743 P.2d 210 (1987), *aff'd in part, vacated in part on other grounds sub nom. Rupe v. Wood*, 93 F.3d 1434 (9th Cir. 1996), asserting RCW 10.95.040's notice requirement applies only to the prosecutor's original decision to seek the death penalty. Majority at 589. However *Rupe* held no new notice was required by the statute when the conviction was affirmed on appeal but remanded for a new sentencing hearing *absent* a new arraignment. *Rupe*, 108 Wn.2d at 740. New statutory notice was obviously not required under those circumstances because there was no new arraignment, as RCW 10.95.040 by its terms requires notice after an arraignment. Thus *Rupe* lends no support to the majority.

The case today *is*, however, identical to *State v. Brett*, 126 Wn.2d 136, 151, 892 P.2d 29 (1995). There the prosecutor properly filed a second notice of intent to seek the death penalty after a *second* arraignment. The procedure followed there should have been followed here.

The majority foreshadows its confusion by speculating it can imagine a case in which the filing of an amended information might raise the need for a new notice to be filed. Majority at 590 n.9. But the prospect of such uncertainty is precisely the reason death penalty statutes must be strictly construed and procedural requirements rigidly observed:

In sum, the requirements of RCW 10.95.040 are quite simple. If the State wishes to seek the death penalty in a particular case, it must file a notice of intent within thirty days of arraignment . . . . It is not unduly burdensome to ask the State to follow these simple procedures, especially when they are so flexible and designed to give the State every reasonable opportunity to file notice.

*Luvene*, 127 Wn.2d at 719.

In matters of life and death we are not in the business of deciding which statutes we must follow and which we may ignore, nor is this the place for judicial "imagination."

## II

### *Denial of Motion for Continuance*

The majority also errs by affirming the trial court's denial of the requested one-week continuance for a competency investigation. Notwithstanding Woods's life hung in the balance, and his mental competence was legitimately in question, the majority is apparently unwilling to spare even a single week for the court to perform its statutorily mandated duty to adequately determine a defendant's mental competency to run the gauntlet of a death penalty sentencing proceeding.

*1. The Trial Court Wrongly Applied the "Threshold Determination" Standard to the Request for a Continuance*

The decision to grant or deny a motion to continue is within the trial court's discretion and is reviewable only for a manifest abuse of discretion. *State v. Adamski*, 111 Wn.2d 574, 577, 761 P.2d 621 (1988). Discretion is abused when the trial court's decision is manifestly unreasonable, or is *exercised on untenable grounds*, or for untenable reasons. *State v. Blackwell*, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993). Here, the "closer, more careful review of the record" required for death penalty sentencing[22] reveals the trial

---

[22] *State v. Lord*, 117 Wn.2d 829, 888, 822 P.2d 177 (1991). We will "more carefully review the factual basis upon which the trial court relied to ensure that the ruling complies with that [abuse of discretion] standard." *Id.*

court's denial of the continuance *was based on an incorrect standard* and was therefore an abuse of discretion. *See State v. Rundquist*, 79 Wn. App. 786, 793, 905 P.2d 922 (1995) (noting that a court has acted for "untenable reasons" and abused its discretion if it has used incorrect standard).

The statute governing competency determinations mandates the court *shall* require an expert examination of the defendant's mental condition when "there is reason to doubt his or her competency." RCW 10.77.060(1)(a). In *State v. Lord*, 117 Wn.2d 829, 901, 822 P.2d 177 (1991) we said such a *hearing* was required "if the court makes the *threshold determination* that there is reason to doubt the defendant's competency." (Emphasis added.)

However here the court applied the "threshold determination" standard to the mere *request for a continuance*. At this stage counsel did not ask for a hearing but a continuance to enable them to investigate and potentially marshal evidence and testimony of the defendant's potential incompetence to use *at* a hearing. *See* Mot. to Continue Penalty Phase, CP at 2583; Cert. of James L. Sheehan (noting "we are simply asking for an additional week to adequately assess the true state of mind of Mr. Woods"). CP at 2591. But the trial judge preempted the process by applying the ultimate standard of proof to the request for time itself. He then denied the continuance based on the unavailability of the very evidence for which the continuance was sought to obtain. But under the statute the court has an independent obligation to convene such a hearing once there is reason to doubt competency. ("Whenever . . . there is reason to doubt [the defendant's] competency, the court . . . shall . . . appoint . . . at least two qualified experts or professional persons . . . to examine and report upon the mental condition of the defendant." RCW 10.77.060(1)(a)).

In contrast the trial judge in *Lord* allowed the defense ample opportunity to produce evidence before ruling on whether the requisite "threshold" had been met. Testimony was allowed from a corrections officer who had transported

*Lord*, and the court "also gave the defense an opportunity to have its own expert examine Lord." *Lord*, 117 Wn.2d at 902. The trial court ruled only *after* allowing the defense an adequate opportunity to meet its burden:

> "So far the defendant has not established sufficient record by testimony, affidavit, medical report or their own statements to trigger a competency hearing. *The appointment of the Western State experts yesterday was an attempt to be, in my opinion, extremely fair to Mr. Lord, to allow, at least before the Court even made a threshold decision about whether to hold a competency hearing, some medical evidence with which to proceed.*"

*Id.* (emphasis added). Such opportunity was preempted here because the ultimate threshold standard was incorrectly applied to the preliminary request for more time to gather evidence.[23]

Denial of a motion for continuance is not grounds for reversal unless it prejudices the defendant. *State v. Eller*, 84 Wn.2d 90, 96, 524 P.2d 242 (1974). But here the prejudice was patent, and denial was particularly egregious when the court applied the wrong standard. *See supra* note 22. A short continuance was not too much to ask to assure that a man on trial for his life is competent to stand trial. That is fundamental.

### 2. A Factual Basis Existed for Woods's Incompetence

The majority's recognition the trial court should have granted the continuance if there were a "factual basis" to doubt Woods's competency, majority at 605, is obscured by its satisfaction with the trial court's meager attempt to determine Woods's competency before trying him for his life:

> THE COURT: I need to know, Mr. Sheehan has alleged that you are ill. Are you?
> MR. WOODS: No.

---

[23] By effectively ending further inquiry into Woods's competency, the court's decision also calls the validity of the subsequent "knowing and intelligent" waiver into question. If the continuance had been granted and Woods ultimately proven incompetent, the waiver would obviously have been illegitimate (and irrelevant).

THE COURT: Are you thinking clearly?

MR. WOODS: Yes.

THE COURT: Are you depressed?

MR. WOODS: No, sir.

THE COURT: Do you know what I mean by that?

MR. WOODS: Yes, I do.

Verbatim Report of Proceedings (VRP) at 5736. Of course, it is bootstrapping at best to rely upon the declarations of a possible incompetent to prove his own competence. Neither the court nor Woods is qualified to adequately evaluate Woods's mental health as even the most capable professional would be hard-pressed to divine his mental status on the basis of four monosyllabic answers to four suggestive questions. These answers do not indicate substantial understanding of the questions, nor did the court make any further effort to establish his level of comprehension or mental competence. The competency statute requires the appointment of experts—so presumably this is a subject to be enlightened by more than lay opinion. *See* RCW 10.77-.060(1)(a) (ordering court to appoint at least two *experts* where there is reason to doubt defendant's competency).

The majority justifies its reliance on the admittedly brief colloquy by the "dearth of other indicia of incompetence." Majority at 607. The majority also recognizes Woods's lack of memory may suggest incompetence, but says it does not equate with a threshold showing of an incompetent mental state "without more." Majority at 607.

I submit the majority's position is a house of cards, permitting erroneous denial of a reasonable request to gather more information on Woods's mental status, then seizing upon the resulting lack of additional information to impeach existing credible evidence which calls his competence into doubt. The sanctity of human life demands more than "the dearth" of consideration the majority gives it.

The majority's reliance on pretrial mental evaluations is also sorely misplaced. Majority at 607. Woods's mental

ability to stand trial is not necessarily determinative of whether, based on his reaction to the guilty verdict, Woods's attorneys should have been given time to assess whether he was competent to assist in his own defense in that phase.

The majority is dismissive of Woods's decision to forgo presentation of mitigation evidence, citing *State v. Sagastegui*, 135 Wn.2d 67, 954 P.2d 1311 (1998) for the proposition a defendant may have legitimate reasons for doing so. Majority at 605-06. Standing alone, the decision to forgo presentation of mitigation may not categorically demonstrate incompetence; however whatever legitimate reasons may exist, Woods must be competent to effectively act upon them. Viewed in the larger context of his memory loss and the all-too-brief colloquy "establishing" his competence, the failure to offer mitigating evidence raises still another doubt of competence. Taken as a whole the evidence more than established the factual basis necessary *to grant a mere continuance*.

## III

### *Implied Waiver of Mitigation Evidence*

While other jurisdictions debate *which* requirements must be included in a colloquy for a valid waiver, our majority still questions *whether* such a colloquy is required at all—and concludes it is not. The majority's willingness to *infer* waiver of something as important as the right to present mitigation evidence is disturbing where a life hangs in the balance, particularly when we could be assured of a knowing and intelligent waiver by the most minimal of procedural safeguards.

A capital defendant has the statutory and constitutional right to present relevant mitigation evidence during sentencing. Majority at 608. Moreover the presentation of such mitigating evidence is necessary for our subsequent proportionality review which includes consideration of similar cases, including mitigating circumstances. *See* RCW 10.95-

.130(2)(b) (requiring court to consider "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant"); *State v. Elmore*, 139 Wn.2d 250, 305, 985 P.2d 289 (1999) ("[W]e consider the circumstances of the crime along with any mitigating factors and determine whether a rational jury could have concluded the mitigating circumstances do not outweigh the circumstances of the crime."), *cert. denied*, 531 U.S. 837 (2000).

Nonetheless, according to the majority, a trial court need not engage in a colloquy to ensure a capital defendant knowingly, intelligently, and voluntarily chooses not to put on the mitigation evidence which may spare his life. Majority at 609. Because it is a decision "influenced by trial strategy," we are told the court need not ask directly but may *infer* knowing and intelligent waiver of this right even where, as here, there is reason to doubt the defendant's underlying competency. *Id.* at 609.[24]

The sparse colloquy here consisted of three questions and monosyllabic answers from Woods:

THE COURT: .... Do you understand that in the death penalty sentencing phase, this next phase we're talking about, you have a right to make an unsworn statement to the jury, that is your right of allocution?

MR. WOODS: Yes.

THE COURT: You also understand that in this phase of the trial you have the right to present mitigation testimony?

MR. WOODS: Yes.

THE COURT: Testimony to persuade the jury that the right choice is leniency, from your perspective?

MR. WOODS: Yes.

---

[24] The majority cites *State v. Thomas*, 128 Wn.2d 553, 559, 910 P.2d 475 (1996), a possession of stolen property case where we concluded the right to testify is among the category of rights for which no on-the-record waiver is required. However, whether one waives his right to remain silent by taking the stand or waives his right to self-representation by appearing with counsel has little or nothing to do with the court's satisfying itself a defendant has knowingly and intelligently waived his right to present mitigation evidence in a death penalty proceeding where the defendant's competency has been raised as an issue.

VRP at 5737.[25] Although even shorter than the admittedly brief colloquy allegedly establishing competency, the majority is satisfied this exchange demonstrates a knowing and intelligent waiver of such an important right, even where competency has been called into question. Indeed, the majority believes such an exchange is not necessary at all—waiver can be inferred.

The majority provides no compelling policy reasons to justify its decision—no judicial economy argument, no parade of horribles—because there are none. At its core, this is simply a question of whether the trial court should be required to take a few extra minutes to establish on the record whether the defendant knowingly and intelligently made a decision to waive a constitutional right which may result in his death. The majority answers that question in the negative, content to abdicate the public responsibility to appropriately impose the death penalty to defense counsel, and wash its hands of the matter.

After the anemic analysis supporting inferred waiver, the majority goes on in dicta to propose an equally flawed middle ground. All the while saying no colloquy is required, the majority erroneously argues this case would pass constitutional muster even if one were. The majority cites the *mandatory* procedures of other states, but does not require them here, and is forced to adulterate those standards in order to make our case fit into a defensible rubric of any sort. The majority's nonmandatory two-part test is a far cry from the procedures employed in the very cases it cites for support.

For example, *Fitzgerald v. State*, 1998 OK CR 68, 972 P.2d 1157 required a defendant: (1) to understand the difference between life and death; (2) to understand and appreciate the vital importance of mitigating evidence in capital proceedings; and (3) to voluntarily and intelligently

---

[25] Unfortunately, such bare colloquies appear to have been the norm throughout this case. *See supra* at 628-29 (Woods deemed competent based on four monosyllabic answers to four suggestive questions).

waive all right to present mitigating evidence. Although the defendant's competence "was not questioned at any point in the proceedings, . . . . [n]othing in the record suggests [he] appeared incompetent or acted in an unusual manner, . . . and no evidence introduced then or at any other proceeding cast doubt on [his] ability to make an intelligent and knowing waiver," the waiver was held invalid because "it is not clear that Fitzgerald understood the purpose or importance of mitigating evidence." *Id.* at 1163, 1173. The court said it required "such stringent procedures" before accepting waiver of mitigation evidence because "the Constitution requires individualized sentencing, and mitigating evidence is an important factor in ensuring this right." *Id.* at 1173 (footnote omitted).

But here, unlike *Fitzgerald*, the defendant's competency *had* been questioned—which should have raised greater cause for concern. Furthermore, here there were but three meager questions about mitigation evidence (and "yes" answers). The majority's assertion that this satisfies the "stringent procedures" required by *Fitzgerald* is nonsense. The majority fails the test set forth in its own case.

Also invoked by the majority is *Chandler v. Florida*, which requires a five-part determination: (1) counsel must inform the court on the record of the defendant's decision; (2) counsel must conduct an investigation for mitigating evidence; (3) counsel must indicate whether they reasonably believe the evidence could be presented; (4) counsel must say what the evidence would be; (5) the court must require the defendant to confirm on the record that counsel discussed these matters and he wishes to waive presentation of mitigation evidence against counsel's advice. *Chandler v. Florida*, 702 So. 2d 186, 199-200 (Fla. 1997).

*Chandler* said the "primary reason for requiring this procedure was to ensure that a defendant understood the importance of presenting mitigating testimony." *Id.* at 199. However, competency was not at issue and the waiver was upheld because the trial court properly followed the procedures. The judge established counsel had thoroughly dis-

cussed the defendant's right to present mitigation, obtained the defendant's clear and unequivocal waiver, and said, " 'I am obliged to tell you by law that this could be a mistake because these people could very well put some favorable information before this jury to persuade them to recommend a life sentence, as opposed to a death sentence[.]' " *Chandler*, 702 So. 2d at 199-200.

In contrast, Woods's competency *had* been challenged and the trial court failed to ensure even the most basic safeguards for knowing and intelligent waiver. The trial court never even established on the record that Woods himself wanted to waive his right to present mitigation evidence. Furthermore, the majority cites no discussion about any mitigation investigation, what the evidence would be, whether counsel specifically communicated that information to the defendant, whether counsel warned him about the consequence of waiver, whether the court warned him he might be making a mistake, or whether Woods had an adequate understanding of the critical role of mitigation evidence in a capital case. Once again, the majority disregards most of the requirements of its own case.

Finally, the majority cites *State v. Ashworth*, which held "a trial court *must* conduct an inquiry of the defendant *on the record* to determine whether the waiver is knowing and voluntary." *State v. Ashworth*, 85 Ohio St. 3d 56, 706 N.E.2d 1231, 1237, *cert. denied*, 528 U.S. 908 (1999) (emphasis added). While *Ashworth* set forth seven required *factors*, the trial court here asked fewer than half that many *questions*! Moreover, our majority would permit that none be asked at all.

*Ashworth* mandated the court must: (1) inform the defendant of the right to present mitigating evidence; (2) explain what mitigating evidence is; (3) inquire and determine whether the defendant understands the importance of mitigating evidence; (4) inquire and determine whether he understands the use of such evidence to offset the aggravating circumstances; (5) inquire and determine whether he understands the effect of failing to present mitigation

evidence; (6) inquire and determine whether he desires to waive the right to present mitigating evidence; and (7) make findings of fact as to the defendant's understanding and waiver of rights. *Ashworth*, 706 N.E.2d at 1237. The court also said the trial court "should be cognizant of actions on the part of the defendant that would call into question the defendant's competence," requiring a competency hearing where there are "indicia of incompetence." *Id.*

In *Battenfield v. Gibson* the Tenth Circuit recently said these requirements were "little more than commonsense and should have been substantially followed by the trial court." *Battenfield v. Gibson*, 236 F.3d 1215, 1233 (10th Cir. 2001). The *Battenfield* court reversed the defendant's death sentence because he did not have a proper understanding of the general nature of mitigating evidence or the specific types that might be available for presentation. *Id.* at 1231. Furthermore, "the trial judge's questioning of Battenfield regarding his decision to waive was brief and, in our view, inadequate. The trial court failed to adequately determine that Battenfield had been provided sufficient information from [his attorney] to make a knowing choice." *Id.*

But here the trial court violated at least five of the seven *Ashworth* requirements, failing to inquire or determine whether Woods understood the importance of mitigating evidence, the use of mitigation evidence to offset the aggravating circumstances, or the effect of failing to present mitigation evidence. The court even failed to inquire on the record whether Woods desired to waive his right to present mitigating evidence, much less make findings of fact as to the defendant's understanding and waiver of rights. All of this occurred in a case which, unlike *Ashworth*, bore indicia of incompetence.

The majority cites numerous cases in which colloquies are required to waive the right to present mitigation evidence. Majority at 610. The elements of those colloquies, and the need to properly establish sufficient waiver on the record, are "little more than commonsense." *Battenfield*, 236 F.3d at 1233. Sadly those vital determinations, and the

common sense that accompanies them, are no longer required in our state.

Because "the penalty of death is qualitatively different from a sentence of imprisonment, however long . . . . there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976) (plurality opinion). More than lip service is required.

For these reasons I would vacate the death sentence.